[No. H023911. Sixth Dist. Apr. 29, 2003.]

AARATHI DESAIGOUDAR, as Trustee, etc., et al., Plaintiffs and Appellants, v.
WADE MEYERCORD et al., Defendants and Respondents.

## COUNSEL

Archer & Hanson, Richard J. Archer; Jaress & Leong and R. Patrick Jaress for Plaintiffs and Appellants.

Oppenheimer Wolff & Donnelly, Michael H. Kalkstein and Valerie M. Wagner for Defendants and Respondents.

## OPINION

**PREMO, Acting P. J.**—In this shareholders' derivative lawsuit, plaintiffs Aarathi and Chan Desaigoudar, as trustees of the Chan Desaigoudar Foundation, allege that eight directors or officers of California Micro Devices Corporation (CMD) wasted corporate assets and breached their fiduciary duties.

The superior court granted a defense motion for summary judgment on the ground that a special litigation committee appointed by the CMD board of directors made a good faith determination that it was not in the company's best interest to prosecute the Desaigoudars' claim. On appeal, plaintiffs

contend: (1) the trial court erred in failing to consider the merits of their claim against the individual defendants; (2) the motion should not have been granted because discovery in the underlying lawsuit was stayed, and (3) the court erred in finding that there were no triable issues of fact.

We hold that judicial review of the decision of a special litigation committee is governed by the business judgment rule. When asserted in connection with a summary judgment motion the material issues of fact relevant to the special litigation committee defense are the independence of the committee members and their good faith in conducting their investigation. Neither the merits of the derivative claim nor the substance of the committee's decision to reject the claim is subject to judicial review at this stage. We reject plaintiffs' additional contentions and affirm the judgment.

## INTRODUCTION

This case revolves around an agreement between CMD, a publicly traded California corporation, and CellAccess, a small Silicon Valley start-up. Chan Desaigoudar was the founder, chief executive officer, and chairman of the board of CMD. Himanshu Vaishnev was a family friend of the Desaigoudars and one of the four founders of CellAccess. Vaishnev approached Chan Desaigoudar about investing in CellAccess and Desaigoudar brought the opportunity to the CMD board. In September 1994 CMD finalized an agreement with CellAccess under which CMD would fund CellAccess research and development and pay a monthly stipend to each of its founders. In exchange, CMD received a 56 percent interest in the new company.

Very shortly after CMD entered into the agreement with CellAccess, CMD became embroiled in accusations of accounting irregularities. The Securities and Exchange Commission and the Department of Justice began investigating reports that CMD had been falsely reporting its revenue. Several lawsuits were filed against the company and its stock price plummeted 40 percent. Allegations surfaced implicating Chan Desaigoudar in the wrongdoing. The board relieved him of his positions as CEO and chairman and hired defendant Jeffrey Kalb to be CEO.

In January 1995 CMD disclosed that for the fiscal year ending June 1994 it had overstated earnings by around $20 million, or 70 percent. The company was facing an indisputably serious business and financial crisis. Kalb decided, with the board's approval, to terminate several projects, including the agreement with CellAccess. Kalb negotiated an agreement under which CellAccess gave CMD a promissory note for the $300,000 CMD had already invested and a warrant for the purchase of CellAccess

stock. In November 1995 FORE Systems, Inc. acquired CellAccess in a stock-for-stock transaction valued at more than $37 million.

The heart of plaintiffs' derivative claim is their allegation that if CMD had not terminated the original agreement with CellAccess it would have had a 56 percent interest in that company worth around $20 million when the company was acquired by FORE Systems, Inc. Instead, CMD had a warrant, which it exercised for a return of only $1.6 million.

## PROCEDURAL BACKGROUND

### *The Pleadings*

The Chan Desaigoudar Foundation is a charitable foundation and a major CMD shareholder. Plaintiffs, in their capacity as trustees of the Chan Desaigoudar Foundation, filed an amended complaint in the form of a shareholders' derivative action.[1] They named eight individuals as defendants and included CMD as a nominal defendant. Defendants Angel Jordan, Wade Meyercord, C. Kumar N. Patel, Stuart Schube, and John Sprague were CMD directors at the time of the alleged wrongdoing. Defendant Scott Hover-Smoot was CMD general counsel and defendant Jeffrey Kalb was president and CEO.

The amended complaint included two causes of action. The first cause of action alleged that the individual defendants had wasted corporate assets because they had not investigated the value of CellAccess before disposing of CMD's interest in it. The second cause of action alleged that the defendants had concealed or misrepresented to the shareholders that they had disposed of corporate assets for less than fair market value in order to increase earnings for the pertinent fiscal quarter and thereby secure shareholder approval of stock options for themselves. The amended complaint also alleged that because a majority of the board was involved in the wrongdoing, it was futile to present a pre-complaint demand to the board. In their answers, all defendants raised the affirmative defenses of the business judgment rule and plaintiffs' lack of standing. CMD also filed a cross-complaint against the plaintiffs.

---

[1] The original complaint was filed September 1997 by Aarathi Desaigoudar, in her representative capacity. That complaint was not styled as a derivative lawsuit, but sought damages payable directly to the plaintiff. The defendants removed the matter to federal court, but it was eventually remanded for lack of subject matter jurisdiction. The superior court granted defendants' first demurrer with leave to amend. The court overruled defendants' demurrer to the amended complaint and the matter was finally at issue in December 1999.

### The Committee's Investigation and the Stay of Proceedings

In February 2000, the CMD board of directors appointed a special litigation committee consisting of two directors who had joined the board after the alleged wrongdoing (the Committee). The board charged the Committee with assessing the merits of the amended complaint and authorized it to take whatever action it deemed necessary on behalf of CMD. Plaintiffs attempted to pursue discovery in the underlying action by propounding a set of Judicial Council form interrogatories to defendant Meyercord and by giving notice of their intention to take the depositions of Vaishnev, defendant John Trewin, and David Schoon, a former member of the CMD board of directors. CMD moved for an order staying the lawsuit until the Committee completed its investigation. The trial court granted the motion and stayed the underlying action pending completion of the Committee's report.

As part of its investigation the Committee wanted to interview Chan Desaigoudar and Himanshu Vaishnev. Both Desaigoudar and Vaishnev insisted that the only way they would speak with the Committee was by way of a deposition. The Committee declined to depose them but continued to seek their voluntary agreement to be interviewed. Plaintiffs filed a motion to lift the stay in order to allow the depositions of Desaigoudar and Vaishnev to go forward. The court denied the motion.

At the conclusion of its investigation in April 2001, the Committee produced a detailed report in which it concluded that the various decisions pertaining to the termination of CMD's investments in CellAccess and other projects were " 'valid exercise[s] of business judgment' based on 'multiple valid business purposes, including the need to conserve cash at a time when the Company's financial resources were limited, the need to focus resources on CMD's core business, and the need to reduce management and resource diversion.' " The Committee found no credible evidence of self-dealing by any of the individual defendants and determined that plaintiffs' stock option allegations were economically irrational. The Committee's ultimate conclusion was that the derivative suit " 'would be unlikely to succeed on the merits, unlikely to result in any monetary recovery to CMD, and wholly opposed to the best interests of CMD.' "

### The Summary Judgment Motion

CMD, joined by the individual defendants, sought to terminate the shareholders' derivative action by means of a motion for summary judgment. The basis for the motion was that a disinterested committee of the board of directors had determined in good faith not to pursue the claims plaintiffs

urged and, as a result, plaintiffs lacked authorization to pursue the claim themselves. Plaintiffs' argument in opposition included a request that the court deny the motion or continue it so that plaintiffs could obtain discovery. (Code Civ. Proc, § 437c, subd. (h).) We shall discuss the moving and opposing papers in detail below. It is sufficient here to note the trial court's ruling: "Plaintiffs' Request for A Continuance is DENIED. (Code of Civil Procedure § 437c[, subd.] (h).) Plaintiffs have failed to present affidavits showing that 'facts essential to justify opposition may exist but cannot, for reasons stated, . . . be presented. . . .'" The court granted defendants' motion for summary judgment, stating: "Plaintiffs have failed to present evidence sufficient to raise a triable issue of fact with respect to whether or not the members of the Special Litigation Committee, J. Daniel McCranie and Donald L. Waite, were 'disinterested' or whether or not the Special Litigation Committee conducted an 'adequate' investigation of the claims presented in the Amended Complaint. . . . *Will v. Engebretson & Co.* (1989) 213 Cal.App.3d 1033 [261 Cal.Rptr. 868] [(*Will*)]."

The court entered judgment for the individual defendants. It is from this judgment that plaintiffs appeal.[2]

## I. QUESTIONS PRESENTED

1. In considering the defense motion for summary judgment, which was brought on the basis of the special litigation committee defense, was the trial court required to consider the merits of the derivative claim?

2. Did the trial court err by granting summary judgment even though the derivative lawsuit and all discovery connected with it had been stayed?

3. Was the trial court correct in finding that on the papers submitted, there was no question of fact warranting trial on the merits?

## II. DISCUSSION

### The Special Litigation Committee Defense

The trial court granted summary judgment because it found no triable issue of fact relating to the independence of the Committee members or to the adequacy of their investigation into the merits of the derivative claim.

---

[2]The trial court did not enter judgment as to CMD because CMD's cross-complaint against the plaintiffs remained to be adjudicated. When a judgment resolves all issues between the plaintiffs and certain of the defendants, either party may appeal from an adverse judgment even though the action remains pending between other parties. (Code Civ. Proc., § 579; *Estate of Gonzalez* (1990) 219 Cal.App.3d 1598, 1601-1602 [269 Cal.Rptr. 68].)

The trial court did not review the merits of the plaintiffs' claim or the reasonableness of the Committee's decision not to pursue it. Plaintiffs argue that because their lawsuit alleged self-dealing among the directors the trial court should not have granted the defendants' summary judgment motion without considering the substance of their claims. The argument presents us with a pure question of law to which we apply our independent review. (*Dawson v. East Side Union High School Dist.* (1994) 28 Cal.App.4th 998, 1025 [34 Cal.Rptr.2d 108].)

In order to put the issue in context, we begin with some basic principles of corporate law. First among these is the nature of the shareholders' derivative lawsuit. ■ Because a corporation is a legal entity separate from its shareholders (*Merco Constr. Engineers, Inc. v. Municipal Court* (1978) 21 Cal.3d 724, 729 [147 Cal.Rptr. 631, 581 P.2d 636]), when a corporation has suffered an injury to its property the corporation is the party that possesses the right to sue for redress. (*Gagnon Co., Inc. v. Nevada Desert Inn* (1955) 45 Cal.2d 448, 453 [289 P.2d 466].) If a corporation fails to pursue redress of an injury, a shareholder may file a derivative action on behalf of the corporation. The "derivative" action is so called because the rights of the plaintiff shareholders derive from the primary corporate right to redress the wrongs against it. (*Ibid.*)

Another principle is the "business judgment rule." ■ The business judgment rule is premised on the notion that management of the corporation is best left to those to whom it has been entrusted, not to the courts. (*Gaillard v. Natomas Co.* (1989) 208 Cal.App.3d 1250, 1263 [256 Cal.Rptr. 702].) The rule requires judicial deference to the business judgment of corporate directors so long as there is no fraud or breach of trust, and no conflict of interest exists. (1 Marsh, Cal. Corporation Law (4th ed. 2000) § 11.03, p. 11-15; see *Gaillard v. Natomas Co., supra,* 208 Cal.App.3d at p. 1263.) The rule has been codified in Corporations Code section 309,[3] which requires a director to perform "in good faith, in a manner such director believes to be in the best interests of the corporation and its shareholders and with such care, including reasonable inquiry, as an ordinarily prudent person in a like position would use under similar circumstances." (§ 309, subd. (a).)[4]

Finally, there is the demand requirement. ■ Unless there are reasons for not doing so, a shareholder must first demand that the company's board

---

[3]Hereafter all undesignated statutory references are to the Corporations Code.

[4]Section 309 reads in full: "(a) A director shall perform the duties of a director, including duties as a member of any committee of the board upon which the director may serve, in good faith, in a manner such director believes to be in the best interests of the corporation and its

of directors pursue the proposed action before the shareholder may undertake the prosecution of a derivative claim. (§ 800, subd. (b)(2).) If the board refuses to pursue the claim, that refusal is protected by the business judgment rule and constitutes a defense to a shareholder's derivative lawsuit.

*Findley v. Garrett* (1952) 109 Cal.App.2d 166 [240 P.2d 421] illustrates the interplay of these rules. *Findley v. Garrett* involved a shareholder's claim that officers and directors of Douglas Aircraft Company had fraudulently organized a second company and utilized the new company for their own profit at the expense of Douglas. (*Id.* at pp. 168-169.) A disinterested majority of the board concluded that it was not in the interests of the company to prosecute the lawsuit. As a result, the case was dismissed on demurrer. The appellate court affirmed, explaining: "It was a question of business whether the transactions over a 12-year period should be investigated and prosecuted. Directors have the same discretion with respect to the prosecution of claims on behalf of the corporation as they have in other business matters." (*Id.* at p. 177.) "Where a board of directors, in refusing to commence an action to redress an alleged wrong against a corporation, acts in good faith within the scope of its discretionary power and reasonably believes its refusal to commence the action is good business judgment in the best interest of the corporation, a stockholder is not authorized to interfere with such discretion by commencing the action." (*Id.* at p. 174.)

■ Although the business judgment rule protects a board's good faith decision to reject a derivative lawsuit, the board cannot avail itself of the protection of the rule if a majority of the board has a personal interest in the outcome. (§ 204, subd. (a)(10)(iii).) Therefore, when the shareholder alleges wrongdoing on the part of a majority of directors, as plaintiffs have alleged

shareholders and with such care, including reasonable inquiry, as an ordinarily prudent person in a like position would use under similar circumstances.

"(b) In performing the duties of a director, a director shall be entitled to rely on information, opinions, reports or statements, including financial statements and other financial data, in each case prepared or presented by any of the following: [¶] (1) One or more officers or employees of the corporation whom the director believes to be reliable and competent in the matters presented. [¶] (2) Counsel, independent accountants or other persons as to matters which the director believes to be within such person's professional or expert competence. [¶] (3) A committee of the board upon which the director does not serve, as to matters within its designated authority, which committee the director believes to merit confidence, so long as, in any such case, the director acts in good faith, after reasonable inquiry when the need therefor is indicated by the circumstances and without knowledge that would cause such reliance to be unwarranted.

"(c) A person who performs the duties of a director in accordance with subdivisions (a) and (b) shall have no liability based upon any alleged failure to discharge the person's obligations as a director. In addition, the liability of a director for monetary damages may be eliminated or limited in a corporation's articles to the extent provided in paragraph (10) of subdivision (a) of Section 204."

in this case, the common practice is for the board to appoint a special litigation committee of independent directors to investigate the challenged transaction. The parties do not dispute that a decision of a special litigation committee not to prosecute a lawsuit, like the decision of the full board, is a defense to a shareholder's derivative action in California. (See *Finley v. Superior Court* (2000) 80 Cal.App.4th 1152, 1161 [96 Cal.Rptr.2d 128] (*Finley*); *Will, supra,* 213 Cal.App.3d at p. 1040.) The issue presented concerns the extent to which the court reviews that decision when it is challenged.

The special litigation committee defense has been recognized in some form or other in almost every state. (*Finley, supra,* 80 Cal.App.4th 1152.) The traditional version of the defense requires the trial court to determine, "as a matter of fact, whether the committee members were disinterested and whether they conducted an adequate investigation. If it answers yes to both questions . . . it must dismiss the derivative action." (*Id.* at pp. 1158-1159, citing cases.) The New York case of *Auerbach v. Bennett* (1979) 47 N.Y.2d 619, 633 [419 N.Y.S.2d 920, 393 N.E.2d 994, 1002] (*Auerbach*) is typically cited as standing for this approach.

A modified version of the defense was described in *Zapata Corp. v. Maldonado* (Del. 1981) 430 A.2d 779, 787-789 (*Zapata*). *Zapata* adopts the *Auerbach* analysis but adds a second, discretionary step in which the court applies its own business judgment to the committee's conclusion. Courts following the *Zapata* approach all require this two-step analysis but vary as to the degree of scrutiny the court may apply to the merits of the committee's decision.[5] (See *Houle v. Low* (1990) 407 Mass. 810, 814-826 [556 N.E.2d 51, 54-60] [trial court must determine whether committee's decision was "reasonable and principled"]; *Alford v. Shaw* (1987) 320 N.C. 465, 468-474 [358 S.E.2d 323, 325-328] [trial court must consider totality of circumstances to determine whether decision was "just and reasonable"]; *Lewis v. Boyd* (Tenn.Ct.App. 1992) 838 S.W.2d 215, 222-226 [trial court must determine whether decision was "reasonable and principled"]; *In re PSE & G Shareholder Lit.* (2002) 173 N.J. 258, 286 [801 A.2d 295, 312] [initial burden is on corporation to prove independence, good faith, due care, and reasonableness of decision].)

A number of states have codified the defense, the majority adhering to section 7.44 of the American Bar Association's 1984 Model Business Corporations Act, which uses the traditional approach. (See *Finley, supra,* 80

---

[5]Defendants refer to the *Auerbach* version as the "majority" rule and the *Zapata* approach as the "minority" version. In fact, with few exceptions the precise elements of the common law defense vary from state to state.

Cal.App.4th at p. 1160; Ariz. Rev. Stat. Ann. § 10-3634; Conn. Gen. Stat. Ann. § 33-724; Fla. Stat. Ann. § 607.07401, subd. (3); Ga. Code Ann. §§ 14-2-744, 14-3-744 [taking a position midway between the model act and the *Zapata* line of cases]; Idaho Code § 30-1-744; Me. Rev. Stat. Ann. tit. 13-A, § 632; Miss. Code Ann. § 79-4-7.44; Mont. Code Ann. §§ 35-1-545, 35-2-1304; Neb. Rev. Stat. Ann. § 21-2074; N.H. Rev. Stat. Ann. § 293-A: 7.44; N.C. Gen. Stat. § 55-7-44; Tex. Bus. Corp. Act Ann. art. 5.14, subds. F, H; Va. Code Ann. § 13.1-672.4; Wis. Stat. Ann. §§ 180.0744, 181.0744.)

Our Supreme Court has not yet considered any aspect of the special litigation committee defense. Decisions of the Ninth Circuit Court of Appeals in California have utilized the *Auerbach* approach. (See *Lewis v. Anderson* (9th Cir. 1979) 615 F.2d 778 (*Lewis*); *Gaines v. Haughton* (9th Cir. 1981) 645 F.2d 761.) Two of our intermediate appellate courts have discussed the question. Plaintiffs rely on the first, *Will, supra,* 213 Cal.App.3d 1033, in support of their argument that the court must review the merits of their claim before dismissing it. *Will,* however, did not reach the issue. In *Will,* the trial court determined that there were triable issues as to the independence of the committee and the good faith of its investigation. (*Will, supra,* 213 Cal.App.3d at pp. 1037-1038.) However, rather than deny the defendant's summary judgment motion, the trial court held a limited evidentiary hearing on those issues. (*Id.* at p. 1038.) The appellate court reversed, holding that summary judgment review of the special litigation committee defense was governed by traditional summary judgment standards. (*Ibid.*) Therefore, since there were triable issues of fact, the motion should have been denied outright and the issues litigated at trial. The court found that a limited hearing was insufficient to protect potentially legitimate shareholder claims. (*Id.* at p. 1043.) *Will* expressly declined to decide the question of whether, after determining the independence of the committee and the adequacy of its investigation, the court must also exercise its independent business judgment in deciding whether to dismiss a derivative suit. (*Id.* at p. 1042.)

In *Finley, supra,* 80 Cal.App.4th 1152, the trial court had agreed to bifurcate the defense so that it would be tried separately, in advance of the derivative claim. (*Id.* at p. 1155.) On appeal, the plaintiffs claimed that the defense was not valid in California and that, to the extent it existed in any form, it was purely a pretrial mechanism and could not be litigated as an affirmative defense at trial. (*Id.* at pp. 1158, 1162.) *Finley* held that the special litigation committee defense is valid in California. The court noted that, as a confluence of the business judgment rule and the demand requirement, the special litigation committee defense serves the same purpose those rules serve. That is, the defense is intended "to further the fundamental

principle that those best suited to make decisions for a corporation—including the decision to file suit on its behalf—are its directors, not its stockholders or the courts. [Citations.] To serve this purpose, the defense must be allowed whenever it is shown that a committee of disinterested directors acting in good faith has determined a derivative action is not in the best interests of the corporation—if possible, on motion, but if necessary, in a full trial." (*Id.* at p. 1163.) In effect, *Finley* held that the substance of the derivative claim was not an element of the defense. We agree with that conclusion.

The primary rationale advanced in support of the two-step approach is that judicial scrutiny of the reasonableness of a business decision not to prosecute a derivative claim (which necessarily includes review of the merits of the claim), minimizes the possibility that the result will have been affected by "structural bias." That is, " '[a] derivative action invokes a response of group loyalty, so that even a "maverick" director may feel compelled to close ranks and protect his fellows from the attack of the "strike suiter." As a result, an outside director independent enough to oppose a chief executive officer with respect to a proposed transaction he thinks is unfair or unwise may still be unable to tell the same officer that he thinks the suit against him has sufficient merit to proceed . . . .' " (*Hasan v. CleveTrust Realty Investors* (6th Cir. 1984) 729 F.2d 372, 377, citing Coffee & Schwartz, *The Survival of the Derivative Suit: An Evaluation and a Proposal for Legislative Reform* (1981) 81 Colum. L.Rev. 261, 283.)

The problem of structural bias was the reason for *Zapata*'s two-step review: "[W]e must be mindful that directors are passing judgment on fellow directors in the same corporation and fellow directors, in this instance, who designated them to serve both as directors and as committee members. The question naturally arises whether a 'there but for the grace of God go I' empathy might not play a role. And the further question arises whether inquiry as to independence, good faith and reasonable investigation is sufficient safeguard against abuse, perhaps subconscious abuse." (*Zapata, supra*, 430 A.2d at p. 787.) *Zapata* added the second step of its analysis in order to "strik[e] the balance between legitimate corporate claims as expressed in a derivative stockholder suit and a corporation's best interests as expressed by an independent investigating committee." (*Id.* at p. 789.)

The rationale for engaging in the *Auerbach* analysis is the courts' reluctance to make business decisions. *Auerbach* recognized that corporate management is best suited to make business judgments: "As with other questions of corporate policy and management, the decision whether and to what extent to explore and prosecute such claims lies within the judgment and

control of the corporation's board of directors. Necessarily such decision must be predicated on the weighing and balancing of a variety of disparate considerations to reach a considered conclusion as to what course of action or inaction is best calculated to protect and advance the interests of the corporation." (*Auerbach, supra,* 47 N.Y.2d at p. 631 [393 N.E.2d at pp. 1000-1001].)

■ We acknowledge that the potential for structural bias requires the court to be " 'mindful of the need to scrutinize carefully the mechanism by which directors delegate to a minority committee the business judgment authority to terminate derivative litigation, particularly when the lawsuit is directed against some or a majority of the directors.' (*Gaines* v. *Haughton, supra,* 645 F.2d at p. 772; fn. omitted.)" (*Will, supra,* 213 Cal.App.3d at p. 1044.) In our view, however, careful scrutiny of a committee's independence and its decisionmaking process strikes an acceptable balance between legitimate shareholder claims and corporate directors' judgment. There are several reasons why we find this to be so.

First, the potential for structural bias is a function of the directors' fiduciary duty to the corporation. As *Lewis* recognized, it is an inescapable aspect of the corporation's predicament that a special litigation committee has to be appointed by interested directors. The corporation may not assign responsibility for evaluating a claim against the company to a wholly independent body separate from the corporation, because to do so would itself be a breach of the fiduciary duty of the board. (*Lewis, supra,* 615 F.2d at p. 783, citing *Auerbach, supra,* 47 N.Y.2d at p. 633 [393 N.E.2d at p. 1002].)[6]

■ Second, the business judgment rule protecting the directors' decision does not apply in the case of bad faith or fraud. The purpose of the court's inquiry into the independence of the committee members and the adequacy of their investigation is to uncover the existence of circumstances that would preclude application of the rule. (*Auerbach, supra,* 47 N.Y.2d at p. 623 [393 N.E.2d p. 996].) " 'The policy reasons for keeping a court from evaluating after the fact the wisdom of a particular business decision do not apply when the issue is whether a party to that decision acted fraudulently or in bad faith. The assessment of fraud or bad faith is a function courts are accustomed to perform, and in performing it the courts do not intrude upon the process of business decisionmaking beyond assuring that those decisions are not improperly motivated.' [Citations.] . . . [T]he business judgment rule was not

---

[6]Section 7.44 of the American Bar Association's 1984 Model Business Corporations Act avoids this predicament by including a provision that permits the court to appoint such an independent body upon the motion of the corporation.

designed to insulate actions of the committee committed in bad faith, and thus the committee should not receive the benefit of the presumption when the court seeks to judge the committee's independence and good faith." (*Will, supra,* 213 Cal.App.3d at p. 1043, citing *Rosenthal v. Rosenthal* (Me. 1988) 543 A.2d 348, 353.)

■ A court's review to uncover bad faith or fraud is not a perfunctory one. In considering the first question—whether the members of a special litigation committee were independent—the court must determine whether each member was " 'in a position to base his decision on the merits of the issue rather than being governed by extraneous considerations or influences.' " (*Katz v. Chevron Corp.* (1994) 22 Cal.App.4th 1352, 1367 [27 Cal.Rptr.2d 681], quoting *Kaplan v. Wyatt* (Del.Super.Ct. 1985) 499 A.2d 1184, 1189.) The director's position with respect to the allegations of the claim and all extraneous influences are subject to the court's scrutiny. The second question—whether a committee employed proper procedures before rejecting the claim—involves an analysis of the committee's good faith. This means that the court must look into the procedures employed and determine whether they were adequate or whether they were so inadequate as to suggest fraud or bad faith. That is, "[p]roof . . . that the investigation has been so restricted in scope, so shallow in execution, or otherwise so *pro forma* or halfhearted as to constitute a pretext or sham, consistent with the principles underlying the application of the business judgment doctrine, would raise questions of good faith or conceivably fraud which would never be shielded by that doctrine." (*Auerbach, supra,* 47 N.Y.2d at pp. 634-635 [393 N.E.2d at p. 1003].) "[I]t [is] necessary for the court to consider whether, on the facts alleged, the refusal of the directors to prosecute the claims was so clearly against the interests of the corporation that it must be concluded that the decision of the directors did not represent their honest and independent judgment." (*Findley v. Garrett, supra,* 109 Cal.App.2d at p. 177.)

■ Finally, the summary procedures utilized in California protect legitimate shareholder suits while permitting exclusion of meritless claims. When the special litigation committee defense reaches the trial court on summary judgment, traditional summary judgment rules apply. (*Will, supra,* 213 Cal.App.3d at p. 1042.) Although plaintiffs suggest that the trial court should have made a factual finding on the merits of the underlying lawsuit, on summary judgment our trial courts may not make findings of fact, but are limited to determining the existence of a factual dispute. This is in contrast with the Chancery Courts of Delaware, which under *Zapata* are permitted to make factual findings. As was held in *Will,* an evidentiary hearing on the special litigation committee defense is insufficient to protect plaintiffs'

interests. (*Ibid.*) Therefore, if a trial court detects a factual dispute concerning the independence of the special litigation committee or the adequacy of its investigation, the case may not be dismissed short of trial.

The trial court therefore did not err in failing to consider the merits of plaintiffs' derivative claim.

### *The Discovery Issue*

■ Plaintiffs next argue that it was error for the superior court to grant summary judgment on a defense as to which plaintiffs were barred from discovery. The argument, in the abstract, has appeal. (See *Krantz v. BT Visual Images* (2001) 89 Cal.App.4th 164, 173 [107 Cal.Rptr.2d 209].) Nevertheless, under the circumstances of this case we reject it.

■ Code of Civil Procedure section 437c, subdivision (h) provides: "If it appears from the affidavits submitted in opposition to a motion for summary judgment or summary adjudication or both that facts essential to justify opposition may exist but cannot, for reasons stated, then be presented, the court shall deny the motion, or order a continuance . . . ." "The nonmoving party seeking a continuance 'must show: (1) the facts to be obtained are essential to opposing the motion; (2) there is reason to believe such facts may exist; and (3) the reasons why additional time is needed to obtain these facts. [Citations.]' [Citation.]" (*Frazee v. Seely* (2002) 95 Cal.App.4th 627, 633 [115 Cal.Rptr.2d 780].) Where a lack of diligence results in a party's having insufficient information to know if facts essential to justify opposition may exist, and the party is therefore unable to provide the requisite affidavit under Code of Civil Procedure section 437c, subdivision (h), the trial judge may deny the request for continuance of the motion. (See, e.g., *Mahoney v. Southland Mental Health Associates Medical Group* (1990) 223 Cal.App.3d 167, 170 [272 Cal.Rptr. 602] [continuance denied for failure to present an affidavit]; *Danieley v. Goldmine Ski Associates, Inc.* (1990) 218 Cal.App.3d 111, 127-129 [266 Cal.Rptr. 749] [same].) The decision whether to grant a continuance is within the discretion of the trial court. Consequently we review the decision under the abuse of discretion standard. (*Frazee v. Seely, supra*, 95 Cal.App.4th at p. 634.)

■ Unlike the usual summary judgment motion, the issues to be decided in a motion based upon the special litigation committee defense are not those framed by the pleadings. Rather, as we explained above, the issues are the independence of the committee members and the adequacy of their investigation. While we think it is beyond question that a plaintiff ought to be permitted discovery on these issues in order to meet the defendant's

motion, it is up to the party to request it. There is no indication in the record that plaintiffs ever attempted, either formally or informally, to obtain information about the members of the Committee or its process of investigation. In their points and authorities in opposition to defendants' motion for summary judgment plaintiffs argued: "Plaintiffs assert the protection of C.C.P. § 437c [subdivision] (h), because Plaintiffs have not been permitted to depose neither [*sic*] the Committee, the witnesses interviewed by the Committee, nor [*sic*] the Defendants." Plaintiffs did not provide an affidavit relating to the possibility that facts essential to justify their opposition might exist or explaining their reasons for not having the evidence. Plaintiffs' counsel did not even mention the discovery issue or request a continuance when arguing at the hearing on the summary judgment motion.

In September 2000 the trial court stayed the proceedings "pending the investigation report by the special litigation committee." Once the Committee made its decision—in April 2001—the Committee's independence and good faith became relevant issues and the stay was by its terms no longer in effect. Therefore, plaintiffs could have then sought the discovery they needed. Furthermore, even if the parties considered the stay to have continued in effect, once the Committee finished its report plaintiffs could have sought relief from the stay to conduct the pertinent discovery. That plaintiffs were aware that they could seek relief is demonstrated by the fact that in January 2001 they actually filed such a motion. However, the only relief they requested was an order requiring the Committee to conduct depositions of Desaigoudar and Vaishnev. The court denied that motion, we think for good reason. Both these individuals were within plaintiffs' own control and discovery procedures were unnecessary for plaintiffs to obtain information from them. The court's denial of that request for relief did not preclude a second request.

In short, plaintiffs did not and, through their own fault, could not provide the court with the information required by Code of Civil Procedure section 437c, subdivision (h). The court therefore did not abuse its discretion in granting the summary judgment motion over plaintiffs' inadequate objection that they had not been permitted discovery.

### *There Were No Triable Issues of Fact*

Having concluded above that the trial court properly considered only the independence of the Committee and the adequacy of its investigation, we come now to the question of whether the court correctly concluded that these issues were undisputed. " 'Summary judgment is granted when a moving party establishes the right to the entry of judgment as a matter of law. (Code

Civ. Proc., § 437c, subd. (c).) In reviewing an order granting summary judgment, we must assume the role of the trial court and redetermine the merits of the motion. In doing so, we must strictly scrutinize the moving party's papers. [Citation.] The declarations of the party opposing summary judgment, however, are liberally construed to determine the existence of triable issues of fact. [Citation.] All doubts as to whether any material, triable issues of fact exist are to be resolved in favor of the party opposing summary judgment. [Citation.] [¶] While the appellate court must review a summary judgment motion by the same standards as the trial court, it must independently determine as a matter of law the construction and effect of the facts presented.' (*Barber v. Marina Sailing, Inc.* (1995) 36 Cal.App.4th 558, 562 [42 Cal.Rptr.2d 697].)

 "A defendant moving for summary judgment meets his burden of persuasion showing that there is no merit to a cause of action if that party has shown that one or more elements of the cause of action cannot be established or that there is a complete defense to that cause of action. (Code Civ. Proc., § 437c, subd. (*o*)(2).) Once the defendant does so, the burden shifts back to the plaintiff to show that a triable issue of one or more material facts exists as to that cause of action or to a defense to the cause of action. In doing so, the plaintiff cannot rely on the mere allegations or denial of his pleadings, 'but, instead, shall set forth the specific facts showing that a triable issue of material fact exists . . . .' (*Ibid.*; see *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 849 [107 Cal.Rptr.2d 841, 24 P.3d 493].)" (*Oakland Raiders v. National Football League* (2001) 93 Cal.App.4th 572, 580-581 [113 Cal.Rptr.2d 255].)

We first consider whether defendants met their burden of producing evidence to establish the elements of their defense.

*The Moving Papers*

CMD listed the following facts in support of its motion for summary judgment:

In February 2000 the CMD board consisted of seven persons; five were defendants in this action (Meyercord, Jordan, Kalb, Schube, and Sprague). The other two members of the board were directors J. Daniel McCranie and Donald L. Waite. The board appointed McCranie and Waite to the Committee.

Waite had been elected to the CMD board in 1997, after the events alleged in the complaint. He had never served as a CMD director before that time

and was never an officer or employee of CMD. Waite was then the executive vice-president and chief administrative officer of Seagate Technology. He was a certified public accountant with experience in the management of publicly held companies.

McCranie was elected to the CMD Board in 1998. He had never previously served as a CMD director and was never an officer or employee of CMD. He retired from his position as executive vice-president of Cypress Semiconductor in January 2001. He was trained in electrical engineering.

In April 2000 the Committee retained the law firm of Brobeck, Phleger & Harrison LLP as its separate counsel. The Brobeck firm had never represented CMD or any of the individual defendants.

Beginning around the middle of the year 2000 and continuing until April 2001, the Committee and its counsel investigated the allegations of the amended complaint and other matters raised by plaintiffs. The Committee met with its counsel at least 13 times. During the investigation the Committee reviewed over 25,000 pages of relevant documents from the parties and from public sources. The Committee interviewed 18 witnesses, including all of the individual defendants. The Committee attempted to interview Chan Desaigoudar but was unable to do so.

All of the preceding facts were supported by the declarations of Waite and McCranie and by the declaration of Susan Samuels Muck, the Committee's separate counsel. Muck described the Committee's investigative procedures and her lengthy and ultimately unsuccessful attempts to interview Desaigoudar and Vaishnev. Waite and McCranie each declared that they had no personal interest in the outcome of the litigation. Neither had any significant business dealings with any of the defendants, the company, or its executive management, and neither had had significant social contact with the defendants or CMD's executive management. Both men declared that the copy of the Committee's report that was attached as an exhibit correctly set forth the course and scope of the Committee's investigation and its conclusions.

The report itself was 103 pages in length, excluding its exhibits. The report expanded upon the details of the investigation, revealing that in addition to interviewing the individual defendants, the Committee interviewed three of the four founders of CellAccess and representatives of FORE Systems, Inc. The report described the circumstances surrounding the company's decision to terminate the CellAccess agreement, noting that around October 1994 the San Francisco Chronicle reported that former CMD employees had accused CMD management of falsifying shipping records and other wrongdoing.

Hitachi Metals Limited (HML), which had invested over $20 million in CMD in March 1994, raised the concern that it had been induced to make that investment based upon fraudulently inflated sales figures. By the end of the first quarter of 1995, CMD was defending a class action suit and federal securities litigation. The company was also concerned about the possibility of litigation with HML. CMD accountants recommended focusing on CMD core business and conserving cash and management resources. It was against this backdrop that Kalb renegotiated the CellAccess research and development agreement and obtained the warrant agreement that ultimately resulted in a return of $1.6 million.

In sum, defendants' moving papers demonstrated that the Committee members were not involved in the challenged transaction and they had the business expertise to evaluate it. They retained an outside law firm with expertise to assist them. They reviewed a substantial number of documents and they interviewed 18 people, the majority of whom had personal knowledge of the transactions and the circumstances surrounding them. With the foregoing facts defendants met their burden of producing evidence to establish the independence of the Committee and the appropriateness of its investigation.

### Plaintiffs' Opposition

In their separate statement in opposition, plaintiffs generally disputed defendants' material facts on the ground that they had not had an opportunity for discovery on the subjects set forth in the motion. Plaintiffs made objections to specific material facts, arguing that McCranie and Waite "are not disinterested for the reasons set forth in Plaintiffs' Memorandum . . . accompanying this response." Plaintiffs attempted to controvert defendants' assertion that the Brobeck firm had not represented any of the individual defendants and had never represented CMD apart from its representation of the Committee by asserting that "Brobeck has represented an officer/employee of CMD." Plaintiffs did not cite any evidence in support of these assertions.

In their memorandum of points and authorities, plaintiffs argued that the Committee was not disinterested, that the Committee's counsel was not independent, and that the investigation was not adequate. Plaintiffs' evidence consisted of the declarations of Desaigoudar and Vaishnev. Desaigoudar stated that an attorney from the Brobeck firm had represented a CMD employee in certain federal litigation. In all other respects his declaration concerned the merits of the derivative claim. Vaishnev's declaration related

exclusively to the underlying lawsuit. Plaintiffs did not submit any other evidence.

*Plaintiffs Did Not Meet Their Burden*

 Plaintiffs' opposition was both procedurally and substantively deficient. The Code of Civil Procedure requires that the party opposing a summary judgment motion file a separate statement in which "[e]ach material fact contended by the opposing party to be disputed shall be followed by a reference to the supporting evidence." Failure to provide a separate statement conforming to this requirement "may constitute a sufficient ground, in the court's discretion, for granting the motion." (Code Civ. Proc., § 437c, subd. (b).) Plaintiffs' separate statement failed to reference any evidence, at all. In any event, the two declarations that plaintiffs submitted did not meet the issues.

Desaigoudar's statement concerning the independence of the Committee's counsel was not sufficient to raise a triable issue. Plaintiffs argue that if the Brobeck law firm represented a CMD employee while at the same time representing the Committee, then the law firm was more likely to be biased in favor of CMD. That is not the point. The Committee engaged counsel to assist in an investigation, not to advocate a position. Moreover, "independent" counsel means counsel that was not associated with the challenged transactions. Plaintiffs presented no evidence that the Brobeck law firm was associated with terminating the CellAccess project. The fact that one partner in the firm represented a CMD employee does not, without more, impugn the independence of the firm with respect to the subject matter of the investigation. The statements in the declarations relating to the substance of the lawsuit concern the reasonableness of the Committee's conclusion, not the good faith of its investigation. Thus, neither of the two declarations plaintiffs offered contained evidence relating to the two issues to be decided.

On appeal, plaintiffs point to the "declarations and other admissible evidence" they submitted in connection with their opposition to the defendants' motion to stay the lawsuit. They argue that evidence supports their contention that there was "a serious question as to the disinterest of the Committee members." Regardless of what that evidence might have shown, plaintiffs did not submit it to the superior court in connection with the summary judgment motion but merely referred to their memorandum filed in connection with the prior motion.

In short, given that plaintiffs made no evidentiary showing to support either their opposition or their request for a continuance, the trial court did not err in granting the motion for summary judgment.[7]

### III. Disposition

The judgment is affirmed.

Elia, J., and Bamattre-Manoukian, J., concurred.

A petition for a rehearing was denied May 28, 2003, and the opinion was modified to read as printed above. Appellants' petition for review by the Supreme Court was denied August 20, 2003. Baxter, J., did not participate therein.

---

[7]Plaintiffs also contend that the business judgment rule does not shield the defendants in this case. Whether or not the business judgment rule applies to the defendants is not the issue. We have applied the business judgment rule to the Committee's decision to reject the claim. It is of no moment that the claim may be founded on an action to which the business judgment rule does not apply. "In this respect the fact that a claim may be founded in fraud does not differentiate it from other claims. Refusal to sue on a fraud claim is not, as plaintiffs contend, a ratification of fraud." (*Findley v. Garrett, supra,* 109 Cal.App.2d at p. 177.)