Filed 4/9/13  First United v. General Motors CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| FIRST UNITED, INC.,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>GENERAL MOTORS LLC,<br><br>    Defendant and Respondent. | D061563<br><br><br>(Super. Ct. No. 37-2010-00072077-<br>CU-BC-EC) |

APPEAL from a judgment of the Superior Court of San Diego County, Joel R.Wohlfeil, Judge.  Affirmed.

Plaintiff and appellant First United, Inc., doing business as De La Fuente Cadillac (at times, De La Fuente), sued defendant and respondent General Motors LLC (GM) for breach of contract and other claims, alleging in part that GM breached certain agreements by unreasonably rejecting plaintiff's proposed purchase of franchise assets and relocation of a Poway Buick-GMC car dealership to plaintiff's El Cajon facility.  The trial court granted GM's motion for summary judgment on grounds, inter alia, plaintiff did not raise

triable issues of material fact as to whether GM breached its contracts with De La Fuente, made actionable misrepresentations or omissions, and tortiously interfered with plaintiff's contract rights or prospective economic advantage. On appeal, plaintiff contends it raised triable issues of material fact as to all of its causes of action except its claim for unfair business practices, which it concedes the court properly summarily adjudicated in GM's favor. We affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff operates a Cadillac dealership on East Main Street in El Cajon, and is certified by GM as a Cadillac motor vehicle dealer under a GM dealer sales and service agreement. Grenier Poway, Inc. (Grenier) formerly operated a Buick and GMC dealership in Poway, California under the terms of a GM dealer sales and service agreement. GM's dealer sales and service agreements incorporate standard provisions that address, among other things, "Dealer Network Planning," "Area[s] of Primary Responsibility" or APRs,[1] and changes in the location or use of the dealer premises.

In June 2009, GM's predecessor filed for bankruptcy protection and eventually sold its assets to GM free and clear of claims, liens and causes of action. GM assumed all continuing dealer agreements, as well as "wind-down" agreements it had offered to certain dealerships, including plaintiff, who had declined to sign it. Thereafter, in August

---

[1] Plaintiff's marketing expert, Edward Stockton, explained that an APR is a dealership's contractually assigned territory, and that some APRs are divided into subsections called "Areas of Geographic Sales and Service Advantage."

2

2009, GM and plaintiff entered into a dealer sales and service agreement (the De La Fuente dealer agreement) identical to their prior agreement.

In February 2010, plaintiff and Grenier entered into an asset purchase agreement under which plaintiff agreed to purchase certain assets of Grenier's Poway Buick-GMC dealership (the proposed relocation agreement). Plaintiff's obligations under the agreement were conditioned in part on GM's approval of plaintiff's operation of a GMC-Buick dealership at its East Main Street location, and plaintiff understood the proposed purchase and relocation of assets from Poway to El Cajon would have to be approved by GM. In May 2010, plaintiff submitted a "change request" to GM for its proposed line asset purchase from Grenier, indicating it would conduct the operations at plaintiff's El Cajon location. Plaintiff's application was accompanied by GM's Dealer Bulletin No. 04-09, containing "policies applicable to all proposed ownership/management changes."

In a letter dated August 9, 2010, GM declined to approve the proposed relocation. Though it determined plaintiff was qualified under the criteria for change in dealer ownership, GM nevertheless informed plaintiff that "GM's network planning for Buick and GMC in Poway is to maintain representation." GM pointed out "[t]he proposed Relocation is approximately twelve (12) miles away in El Cajon, CA and having Buick-GMC representation in El Cajon is inconsistent with the GM's dealer network planning for both the Poway and El Cajon communities as well as the San Diego Multiple Dealer Area . . . ." Reciting the first paragraph of article 4.1 of the De La Fuente dealer

3

agreement as to dealer network planning,[2] GM stated, "GM has determined that the proposed Relocation is inconsistent with its planning as set forth above . . . ."

Grenier eventually terminated its dealer agreement with GM. GM approved the application of a former dealer as the replacement Buick-GMC dealer at the Poway location.

In November 2010, plaintiff sued GM for breach of contract, breach of the implied covenant of good faith and fair dealing, negligent and intentional misrepresentation, interference with contract/economic advantage, and unfair business practices.[3] Plaintiff alleged GM's stated reason for rejecting the asset purchase and relocation was unreasonable, arbitrary, pretexual, and contrary to the terms and intent of the dealer

---

[2] Article 4.1 of GM's standard provisions provides: "Because [GM] distributes it's [*sic*] Products through a network of authorized dealers operating from approved locations, those dealers must be appropriate in number, located properly, and have proper facilities to represent and service [GM] Products competitively and to permit each dealer the opportunity to achieve a reasonable return on investment if it fulfills its obligations under its Dealer Agreement. Through such a dealer network, [GM] can maximize the convenience of customers in purchasing Products and having them serviced. As a result, customers, dealers, and [GM] all benefit. [¶] To maximize the effectiveness of its dealer network, [GM] agrees to monitor marketing conditions and strive, to the extent practicable, to have dealers appropriate in number, size and location to achieve the objectives stated above. Such marketing conditions include [GM] sales and registration performance, present and future demographic and economic considerations, competitive dealer networks, the ability of [GM] existing dealers to achieve the objectives stated above, the opportunities available to existing dealers, the alignment of Line-Makes, [GM] dealer network plan, and other appropriate circumstances." We note, as does plaintiff, that the dealer agreement provides it is "governed by the laws of the State of Michigan." Neither party raised a choice of law issue below, nor have they before us. We agree the parties mutually waived or abandoned in this appeal any arguments concerning choice of law or right to enforce the choice of law provision.

[3] Plaintiff also sued Grenier, but the record does not indicate that Grenier moved for summary judgment. Accordingly, we do not address the causes of action against Grenier.

4

agreements, and that at the time, GM had no expectation that any GM dealer would continue to operate in Poway or any basis for its position that the proposed relocation was contrary to the reasonable goals of dealer network planning. Plaintiff alleged GM breached the De La Fuente dealer agreement and other agreements, as well as the implied covenant of good faith and fair dealing, by unreasonably refusing to approve the proposed relocation agreement, failing to sufficiently consider promotion and preservation of competition and customer satisfaction, and refusing its application on "false and pretextual grounds . . . ." Plaintiff alleged GM intentionally and negligently withheld material facts relating to GM's willingness or ability to perform its obligations; misrepresented to plaintiff that it would treat dealer transfer applications in a fair, reasonable, nonarbitrary and nondiscriminatory manner; and misrepresented the reasons for disapproving the transfer. Plaintiff alleged GM intended to disrupt the contractual and economic relationships between it and Grenier, and engaged in unfair trade practices by unreasonably withholding consent to the purchase agreement in violation of Vehicle Code section 11713.3. Plaintiff sought declaratory and injunctive relief as to the nature of the written agreements between it and GM, and GM's obligations in regard to the approval of dealership transfer applications.

GM moved for summary judgment or alternatively summary adjudication of issues. It argued the De La Fuente dealer agreement did not give plaintiff any contractual right to require GM to authorize plaintiff to sell and service Buick and GMC vehicles in El Cajon; that it only gave plaintiff contractual rights regarding the Cadillac line. GM further argued that the *Grenier* dealer agreement provided GM with a complete defense,

5

i.e., the right to make the "final decision" regarding approval or disapproval of any proposed change in location of Grenier's dealership pursuant to its business judgment.

GM presented a declaration from Dale Sullivan, its regional director of business operations for GM's western region, who averred that plaintiff does not and never had any contractual relationship with GM regarding the Buick or GMC line-makes. Sullivan further stated: "Based on their geographic separation and the mountainous terrain between Poway and El Cajon, as well as the circuitous freeways and mountain roads that provide access between the two communities, GM concluded that the proposed relocation of the Buick-GMC dealership from Poway to El Cajon would have made it very difficult for [plaintiff] to adequately serve Buick-GMC sales and service customers in the Poway market." GM also presented a declaration from a member of its legal staff who explained that after the June 2009 bankruptcy, the bankruptcy court enjoined all persons having claims against GM's predecessor from asserting those claims against GM, and that plaintiff's claims in the present case were not included in the liabilities GM agreed to assume from its predecessor.

Plaintiff opposed the motion. It argued the stated reason for GM's disapproval of the proposed relocation agreement was without documentation and a pretext; that the true reason was GM's "historical animus" against plaintiff and its owner. It maintained that the concept of dealer network planning under the De La Fuente dealer agreement was "an amorphous and ever-mutating concept that apparently has no fixed criteria whatsoever" and that GM's position was contradicted by the fact that GM considered Poway and El Cajon within the same market for Buick and GMC. Plaintiff argued there were triable

6

issues of material fact as to GM's contractual duties to plaintiff under the De La Fuente dealer agreement with respect to GM's consideration and disapproval of plaintiff's change request as well as whether GM's disapproval of the deal was a proper exercise of its business judgment.  According to plaintiff, a jury could conclude that GM had improper motives or made an insufficient inquiry to support its conclusion that the transfer of the lines to plaintiff was incompatible with its dealer network planning.  Plaintiff also argued its misrepresentation claims stemmed from a 2009 statement made by GM agent Kate Hardy that the criteria for GM's approval of plaintiff acquiring Buick and GMC product lines was the closing of one of the five GM locations in San Diego County.

Plaintiff submitted a declaration from its secretary and a stockholder in the corporation, David Wick.  Wick stated he had been personally involved since 2007 in plaintiff's efforts to acquire from GM the right to sell Buick and GMC product lines, and recounted plaintiff's unsuccessful efforts to purchase another Buick-Pontiac-GMC dealership located in Lemon Grove (the McClellan dealership) in June and July 2007.  He averred that after GM's predecessor went bankrupt, it tried to take away plaintiff's dealership by petitioning the federal court for an order cancelling plaintiff's dealer agreement, but eventually, on the day of the court hearing, agreed to enter into "the exact same contract" with plaintiff.  Wick described representations made by GM agent Kate Hardy as to the criteria for plaintiff's acquisition of the Buick and GMC product lines: that GM "only wanted 5 Buick/GMC locations (or, 'points' as they are known in the trade) in San Diego County."  He asserted GM's rejection of the proposed relocation agreement was not reasonable because De La Fuente and Grenier were already obligated

7

based upon their respective contracts with GM to service each others' areas, and GM's rejection "assumes that GM could not have simply approved the specific transaction for Grenier, which was going out of business, to sell to [*sic*] its franchise rights to [De La Fuente], and then approving another operator for the Poway location." Wick stated that at the time of GM's rejection, GM maintained an "open point"[4] at the former McClellan dealership in Lemon Grove, which was less than 10 miles from plaintiff's location, and "[n]othing prevented GM, assuming it wanted to have a dealer in Poway, from giving [plaintiff] that (Lemon Grove) 'open point' that had sat fallow for years after GM (in 2007) rejected [plaintiff's] bid to move those lines to El Cajon."

Plaintiff also presented a declaration from Stockton, an expert in "sales performance measurement" including brand performance or market share, and dealer sales performance. Stockton criticized GM's reliance on travel conditions between dealerships (as opposed to markets) as "an inferior and unconventional manner of assessing proximity of customers to dealerships," and opined that GM's policy as to the plaintiff's and Grenier's APRs was inconsistent with the notion that Poway and El Cajon were "practically and commercially separate." He averred that plaintiff would have been the Buick-GMC dealership with the primary territorial advantage over at least some of the territory within the Lemon Grove open point, and the territory would have enhanced

---

4    Plaintiff's expert Stockton explained that an open point is a geographic area in which no authorized dealership is active, but future authorized representation is planned or at least contemplated. He states: "When a manufacturer closes an Open Point (as opposed to filling an Open Point with an authorized dealership), this action signals the intention to service the territory in the Open Point by surrounding dealerships."

the market potential of plaintiff's prospective Buick-GMC dealership. Stockton reviewed a GM network plan and market study performed by a company called Channel Vantage, stating it did not make a "comparative assessment of the relative desirability of the Poway and El Cajon locations." He averred: "There are several techniques available for assessing the relative desirability of locations, and while these techniques are not necessarily determinative, none were attempted." According to Stockton, GM's arguments and its market study did not "allow for an evaluation of the customer convenience and/or dealership access implications if GM were to approve the [De La Fuente] location."

After ruling on the parties' evidentiary objections and excluding the evidence to which objections were sustained, the court granted summary judgment. Applying the business judgment rule as set forth in *Berg & Berg Enterprises, LLC v. Boyle* (2009) 178 Cal.App.4th 1020, 1045, it ruled plaintiff had not presented evidence demonstrating GM's unreasonableness or improper motive, and thus did not create a triable issue of fact to overcome a presumption that GM's exercise of its business judgment was sound. Having reviewed the Wick and Stockton declarations, the court concluded it could not logically infer that GM acted with a conflict of interest, improper motives, fraud, bad faith, or that GM was " 'overreaching.' " The trial court therefore deferred to GM's business judgment. It ruled Hardy's representation, even if true, did not prove GM promised to approve plaintiff's acquisition or the relocation of an existing dealership. It ruled plaintiff had not shown wrongdoing or tortious conduct for purposes of its interference with contract or prospective advantage claims, nor had it shown injury or damages. Finally, as to

9

plaintiff's unfair business practices claim, the court ruled plaintiff did not have standing to assert the protections of Vehicle Code section 11713.3, but even if the statute applied, plaintiff had not presented evidence that GM's consent to the dealership transfer was unreasonably withheld.

Plaintiff timely filed this appeal.

DISCUSSION

I. *Summary Judgment Standards*

Summary judgment is appropriate if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  (Code Civ. Proc., § 437c, subd. (c).)

A defendant moving for summary judgment "bears the burden of persuasion that 'one or more elements of' the 'cause of action' in question 'cannot be established,' or that 'there is a complete defense' thereto.  [Citation.]  . . .  [T]he party moving for summary judgment bears an initial burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact; if he carries his burden of production, he causes a shift, and the opposing party is then subjected to a burden of production of his own to make a prima facie showing of the existence of a triable issue of material fact.  . . .  A prima facie showing is one that is sufficient to support the position of the party in question."  (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850-851; *Knowles v. Superior Court* (2004) 118 Cal.App.4th 1290, 1301.)  "There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the

underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof."  (*Aguilar*, at p. 850.)

In conducting a summary judgment analysis, this court does not consider evidence "to which objections have been made and sustained."  (Code Civ. Proc., § 437c, subd. (c); *Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 334.)  The trial court's evidentiary rulings are reviewed for abuse of discretion.  (*Miranda v. Bomel Construction Co., Inc.* (2010) 187 Cal.App.4th 1326, 1335; *Barragan v. Lopez* (2007) 156 Cal.App.4th 997, 1003.)  Plaintiff bears the burden of demonstrating that the trial court's evidentiary rulings were incorrect and prejudicial.  (*Carnes v. Superior Court* (2005) 126 Cal.App.4th 688, 694.)

We review the summary judgment ruling under a de novo standard, applying the same rules and standards that govern the trial court's determination.  (*Howard v. Omni Hotels Management Corp.* (2012) 203 Cal.App.4th 403, 419.)  "[W]e view the evidence in the light most favorable to the losing plaintiff, liberally construing the plaintiff's submissions and strictly scrutinizing the defendant's showing, to resolve any evidentiary doubts or ambiguities in the plaintiff's favor."  (*Id*. at p. 420.)

## II.  *Breach of Contract*

Plaintiff contends it raised a triable issue of material fact as to its breach of contract cause of action.  Specifically, it argues article 4.4.2 of the De La Fuente dealer agreement is unambiguous and must be interpreted to require GM to evaluate its proposed change in use of its premises, including the addition of Buick-GMC lines, and apply a good faith exercise of its business judgment as to that proposal.  It maintains its

11

evidence raises a triable issue as to whether GM reasonably and in good faith exercised its business judgment in rejecting the proposed relocation agreement. Plaintiff further argues, for the first time on appeal, that the dealer agreement is a contract of adhesion, which requires ambiguities to be resolved against GM, the party who drafted it. Whether a contract is one of adhesion depends on whether the weaker party is free to negotiate and alter the printed terms of the proffered agreement. (See *Parr v. Superior Court* (1983) 139 Cal.App.3d 440, 444.) Because plaintiff did not assert this fact-based theory in its summary judgment opposition below, it is forfeited for purposes of appellate review. (*Peart v. Ferro* (2004) 119 Cal.App.4th 60, 70.)

In response, GM argues that article 4.4.2 only governs the location and permitted uses of De La Fuente's Cadillac dealership facility without giving De La Fuente an affirmative contract right to apply to GM to acquire or add product lines.[5] GM argues the actual decision challenged by plaintiff is GM's decision in response to *Grenier's* proposal to change ownership, which is governed by a separate contract: *Grenier's* dealer

_____

[5]     Both plaintiff and GM point to the trial court's conclusions about the De La Fuente dealer agreement, i.e., that it does not give De La Fuente the right to require GM to authorize it to service any other line-make, and that De La Fuente's right to seek GM's approval for a change in use of the premises "does not provide that Plaintiff has a contract right to require [GM] to accept or review an application for additional [GM] product lines." GM argues the court's conclusion alone warrants summary adjudication on plaintiff's breach of contract cause of action. Because our summary judgment review is de novo, the trial court's conclusions are not relevant to the analysis. This is particularly true when the matter involves interpretation of a written contract, which is a judicial function unless the interpretation turns on the credibility of extrinsic evidence. (*Hess v. Ford Motor Co.* (2002) 27 Cal.4th 516, 527; *Scheenstra v. California Dairies, Inc.* (2013) 213 Cal.App.4th 370, 390.) The interpretation of a contract is a question of law even when conflicting inferences may be drawn from uncontroverted evidence. (*Hess*, at p. 527.)

12

agreement. Because De La Fuente did not apply to GM to become a Buick-GMC authorized dealer under Grenier's agreement, GM asserts, the proposed relocation was "moot *ab initio*." And, GM argues, the Grenier agreement, specifically articles 4.4.2 and 12.2.2 regarding changes in ownership and management, also governed GM's consideration of plaintiff's request to acquire the existing dealership and remove it from Poway. GM argues that as a result, plaintiff has no standing to enforce the Grenier contact, did not have a contractual relationship with GM regarding the Buick and GMC lines, and cannot impose an obligation on GM to consider an application from or enter into a relationship with a third party. The only contractual right GM recognizes is plaintiff's right to seek approval for a change in use; GM argues that under article 4.2.2, that right "obviously would require GM to evaluate [plaintiff's] proposal and exercise its business judgment in light of *Cadillac* dealer network planning considerations."

A. *The Relevant Contract Provisions*

GM's standard provisions, including the provisions at issue, are incorporated in all GM dealer sales and service agreements. In plaintiff's case, the standard provisions are appended to a dealer sales and service agreement giving plaintiff the right to purchase and sell only Cadillac products. As plaintiff essentially concedes,[6] nothing within its

---

[6]     Plaintiff asserts it "has never argued that it has a right to **require** GM to authorize it to sell Buick and GMC *regardless* of any other considerations or factors." It concedes the trial court was correct in stating that it "has no contract right to *require* GM to 'accept' its proposed new use of the dealership premises." Plaintiff states it "has never asserted that GM is *required* to approve a change in dealer use of the premises, regardless of any other facts or circumstances."

13

agreement, or the GM standard provisions, gives plaintiff an affirmative right to purchase or sell Buick-GMC vehicles.

Article 4.4.2 of GM's dealer agreement addresses changes in locations and uses of dealer premises. It provides: "If Dealer wants to make any change in location(s) or Premises, or in the uses previously approved for those Premises, Dealer will give [GM] written notice of the proposed change, together with the reasons for the proposal, for [GM's] evaluation and final decision in light of dealer network planning considerations. No change in location or in the use of Premises, including addition of any other vehicle lines, will be made without [GM's] prior written authorization pursuant to its business judgment. [¶] Before [GM] requires any changes in Premises, it will consult with Dealer, indicate the rationale for the change, and solicit Dealer's views on the proposal. If, after such review with Dealer, [GM] determines a change in Premises or location is appropriate, the Dealer will be allowed a reasonable time to implement the change. Any such changes will be reflected in a new Location and Premises Addendum or other written agreement executed by Dealer and General Motors. [¶] Nothing herein is intended to require the consent or approval of any dealer to a proposed relocation of any other dealer."

Article 12.2 of GM's standard provisions provides in part: "If Dealer proposes a change in Dealer Operator, a change in ownership, or a transfer of the dealership business or its principal assets to any person conditioned upon [GM] entering into a Dealer Agreement with that person, [GM] will consider Dealer's proposal and not unreasonably refuse to approve it, subject to the following: [¶] . . . [¶] . . . [GM] agrees to consider

14

Dealer's proposal, taking into account factors such as (a) the personal, business, and financial qualifications of the proposed dealer operator and owners, and (b) whether the proposed change is likely to result in a successful dealership operation with acceptable management, capitalization, and ownership which will provide satisfactory sales, service, and facilities at an approved location, while promoting and preserving competition and customer satisfaction."

In interpreting a written agreement, our goal is to give effect to the mutual intent of the parties as it existed at the time, insofar as that intent can be ascertained and is lawful. (Civ. Code, § 1636; *People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.* (2003) 107 Cal.App.4th 516, 525.) If the language of the agreement is clear and explicit and does not involve an absurdity, determination of the mutual intent of the parties and interpretation of the agreement is to be based on the language of the agreement alone. (Civ. Code, §§ 1638, 1639; *People ex rel. Lockyer*, at p. 525.) Further, "[t]he whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other." (Civ. Code, § 1641.) The language " ' "in a contract must be construed in the context of that instrument as a whole." ' " (*Palmer v. Truck Ins. Exchange* (1999) 21 Cal.4th 1109, 1118.) If possible, the court should give effect to every provision of the contract. (*National City Police Officers' Assn. v. City of National City* (2001) 87 Cal.App.4th 1274, 1279.)

Neither party asserts there are ambiguities in the contractual language, nor does either party suggest any interpretation of article 4.4.2's phrase "change . . . in the uses previously approved for those Premises" other than it should be understood by its plain

15

meaning. Reading the De La Fuente dealer agreement with all of its related agreements, we conclude that the only affirmative contractual obligation imposed on GM in article 4.4.2 is to evaluate and make a final decision on plaintiff's May 2010 proposed change request (which happened to request the addition and relocation of Grenier's Buick-GMC line) in light of dealer network planning considerations. The second sentence of article 4.4.2 plainly only prohibits dealers from making a location change or adding vehicle lines without GM's prior written authorization, which is to be made "pursuant to its business judgment."

Any proposed transfer of dealership business is governed by article 12.2, but the reference to "*the* dealership business" plainly is to De La Fuente's Cadillac dealership, not any other dealership, including Grenier's. Under that provision, GM's contractual obligation to consider De La Fuente's proposal (and not unreasonably refuse to approve it) arose only if De La Fuente proposed a transfer of its Cadillac dealership.

In short, nothing in article 4.4.2 obligates GM to exercise its business judgment, and it does not impose any reasonableness standard upon GM in evaluating any proposed change in use. GM inserted a reasonableness standard in article 12.2, but omitted any such standard in article 4.4.2. " ' "It is a general rule governing the construction of contracts that unless a contract is ambiguous, its meaning must be determined from the words used; and courts will not, because a more equitable result might be reached thereby, construe into the contract provisions that are not therein. In construing a contract which purports on its face to be a complete expression of the entire agreement, courts will not add thereto another term, about which the agreement is silent." ' " (*Apra v.*

16

*Aureguy* (1961) 55 Cal.2d 827, 830-831, citations omitted; *Edwards v. Arthur Andersen, LLP* (2008) 44 Cal.4th 937, 954 ["when courts construe an instrument, a judge is 'not to insert what has been omitted, or to omit what has been inserted' "].) Our interpretation of contractual language is de novo, and thus it is of no import that GM appears to concede in its respondent's brief that article 4.4.2 requires it to "evaluate [De La Fuente's] proposal and *exercise its business judgment* in light of Cadillac dealer network planning considerations."

We decline to import the statutory (Corp. Code, § 309, subd. (a)) or common law business judgment rule into section 4.4.2 of the contract, as the trial court did below.[7] Nothing in the record indicates that GM's decision to reject De La Fuente's proposed

---

[7] The common law business judgment rule insulates from court intervention management decisions made by corporate directors in good faith in what the directors believe is the organization's best interests. (*Scheenstra v. California Dairies, Inc.*, *supra*, 213 Cal.App.4th at p. 387; *Berg & Berg Enterprises, LLC v. Boyle*, *supra*, 178 Cal.App.4th at p. 1045.) "The . . . rule is ' " 'a judicial policy of deference to the business judgment of corporate directors in the exercise of their broad discretion in making corporate decisions.' " [Citations.] [It] is based on the premise that those to whom the management of a business organization has been entrusted, and not the courts, are best able to judge whether a particular act or transaction is helpful to the conduct of the organization's affairs or expedient for the attainment of its purposes. [Citations.] The rule establishes a presumption that directors' decisions are based on sound business judgment, and it prohibits courts from interfering in business decisions made by the directors in good faith and in the absence of a conflict of interest. [Citations.] ' "A hallmark of the business judgment rule is that a court will not substitute its judgment for that of the board if the latter's decision can be 'attributed to any rational business purpose.' " ' " (*Berg*, at p. 1045.) The rule, however, does not shield actions taken without reasonable inquiry, with improper motives, or as a result of a conflict of interest. (*Ibid*.) In most cases, the presumption created by the business judgment rule can be rebutted only by evidence establishing "fraud, bad faith, overreaching or an unreasonable failure to investigate material facts. [Citation.] Interference with the discretion of directors is not warranted in doubtful cases." (*Id*. at p. 1046.)

17

relocation was made by or at the direction of GM corporate directors, nor is there any indication the parties in entering into the dealer agreement intended the phrase "business judgment" to refer to that judicial policy of deference (*Everest Investors 8 v. McNeil Partners* (2003) 114 Cal.App.4th 411, 429), which is commonly invoked in shareholder derivative actions. (See *Scheenstra v. California Dairies, Inc.*, *supra*, 213 Cal.App.4th at p. 387; *Desaiqoudar v. Meyercord* (2003) 108 Cal.App.4th 173, 179 [in a derivative action, "judicial review of the decision of a special litigation committee is governed by the business judgment rule"]; but see *Everest Investors 8*, at pp. 430-432 [concluding in a nonderivative action by a limited partner that triable issues of material fact existed as to general partnership's improper motives and conflict of interest, which precluded summary judgment based on the business judgment rule].)

B. *Plaintiff's Evidence Does Not Raise A Triable Issue of Material Fact as to GM's Breach of the De La Fuente Dealer Agreement or Breach of the Covenant of Good Faith and Fair Dealing*

Having determined the parties' rights and obligations under the De La Fuente dealer agreement and its related agreements, we evaluate whether GM met its threshold summary judgment burden, and whether plaintiff's evidence raised a triable issue of material fact, as to GM's alleged breach of contract. As we have stated, the De La Fuente dealer agreement imposed a contractual obligation on GM to evaluate and make a final decision on plaintiff's May 2010 relocation proposal in light of dealer network planning considerations.

18

In its moving papers, GM presented evidence sufficient to meet its threshold burden to show it met its contractual obligation to evaluate De La Fuente's proposal and make a final decision in light of dealer network planning considerations. Plaintiff in its responding separate statement did not dispute that the GM zone manager responded to its change request on August 9, 2010 (asserting the letter speaks for itself). In doing so, the zone manager quoted GM's dealer network planning considerations set forth in article 4.1 of the De La Fuente dealer agreement, including the fact that dealers must be "located properly" and GM's dealer network must "maximize the convenience of customers in purchasing Products and having them serviced." (Italics omitted.) The zone manager explained that "GM's network planning for Buick and GMC in Poway is to maintain representation"; that the proposed relocation to El Cajon was 12 miles away; and that the relocation proposal was thus "inconsistent with the GM's [*sic*] dealer network planning for both the Poway and El Cajon communities as well as the San Diego Multiple Dealer Area." GM also presented, via Sullivan's declaration, a reason for rejecting the proposed relocation agreement grounded in factors set out in GM's dealer network plan; that is, the distance between Poway and El Cajon would have made it difficult for De La Fuente to adequately serve Buick-GMC customers in the Poway market both for sales and service. This shifted the burden to plaintiff to demonstrate the presence of issues of material fact on the question.

We cannot say plaintiff demonstrated, either directly or by inference, that GM failed to meet its contractual obligations under article 4.4.2. Plaintiff sought to present evidence that GM conducted an unreasonable inquiry and failed to follow its normal

19

policies, or that it acted on pretext or improper motives. It argues expert Stockton's declaration raised issues for a jury as to whether GM failed to follow ordinary procedures in assessing the proposed sale of the Buick and GMC lines, including by showing GM's analysis failed as a matter of process. Plaintiff maintains its opposing summary judgment evidence raises an inference of pretext or improper conduct by GM; that GM's market analysis was a "sham" to "insulate a decision to quash the Grenier sale that GM made long before it even commissioned the market study to begin with." It relies on *Desaigoudar v. Meyercord*, *supra*, 108 Cal.App.4th 173,[8] and cases from the Second Circuit and other federal district courts. We have rejected any assertion that the dealer agreement incorporated principles of the business judgment rule, and thus plaintiff misplaces its efforts to demonstrate some sort of pretext, improper motive, or inadequate investigation on GM's part. Moreover, we are not bound by the cited federal authorities. (See *People v. Gonzales and Solis* (2011) 52 Cal.4th 254, 296.)

At oral argument, plaintiff nevertheless maintained that Stockton's averments in paragraphs 13, 16 and 17 of his declaration raise a triable issue of material fact as to whether GM made its evaluation and final decision *in light of dealer network planning*

---

[8]  In *Desaigoudar*, *supra*, 108 Cal.App.4th 173, the court held that to raise a triable issue of material fact as to the inadequacy of an investigation so as to preclude application of the business judgment rule, a plaintiff must show the procedures employed by the directors (or in that case, a special litigation committee) were so inadequate to suggest fraud or bad faith. (*Desaigoudar*, at p. 189.) According to *Desaigoudar*, " '[p]roof . . . that the investigation has been so restricted in scope, so shallow in execution, or otherwise so *pro forma* or halfhearted as to constitute a pretext or sham, consistent with the principles underlying the application of the business judgment doctrine, would raise questions of good faith or conceivably fraud which would never be shielded by that doctrine.' " (*Ibid*.)

*considerations.* In these paragraphs, Stockton stated De La Fuente would have had a territorial advantage over some of the Lemon Grove open point territory, which would have enhanced the market potential of the prospective De La Fuente Buick/GMC/Cadillac dealership; that GM's Channel Vantage market study showed that GM's effective market shares for Buick and GMC were lower in De La Fuente's area of geographic sales and service advantage; and that, in Stockton's experience, GM associated low effective market shares with lost opportunity for the brand, and that GM had taken the position in contested matters that this factor pointed to the need for additional authorized representation. Stockton also stated that the Channel Vantage market study calculated similar expected vehicle registrations in both De La Fuente's and Grenier's areas, and he criticized the market study for failing to make a comparative assessment of the relative desirability of the Poway and El Cajon locations. None of these averments, which merely posit the inadequacy of GM's analysis or suggest that GM should have viewed the data differently to reach a different result, contradict GM's showing that it did in fact take into account elements of its dealer network planning in rejecting the proposed relocation. That was its only obligation under the De La Fuente dealer agreement.

We acknowledge, of course, that implied in every contract there is a covenant of good faith and fair dealing not to do anything that would destroy or injure the other parties rights under the contract. (*Wilson v. 21st Century Ins. Co.* (2007) 42 Cal.4th 713, 720; *Peak-Las Positas Partners v. Bollag* (2009) 172 Cal.App.4th 101, 105.)

21

" ' " '[W]here a contract confers on one party a discretionary power affecting the rights of the other, a duty is imposed to exercise that discretion in good faith and in accordance with fair dealing' " ' " and that good faith and reasonableness are questions of fact. (*Peak-Las Positas*, at p. 106 [" 'Denying consent solely on the basis of personal taste, convenience or sensibility is not commercially reasonable' "].)

Applying these standards to GM's obligation to evaluate and make a final decision on plaintiff's relocation proposal, we cannot say Stockton's declaration raises issues for a jury to decide as to whether GM acted unreasonably to harm plaintiff's rights under the De La Fuente dealer agreement. First, Stockton does not squarely focus on the pertinent inquiry: whether GM evaluated and made a final decision on plaintiff's proposal in light of dealer network planning considerations. Stockton's statements that GM's comparison of travel times is an "unconventional manner of assessing proximity of customers to dealerships" or that he had never seen GM evaluate customer proximity in this way, does not establish, or raise a reasonable inference, that GM either failed to make a decision, or made its decision in disregard of its dealer network planning policies. Stockton criticized the Channel Vantage market study data as failing to properly compare the relative desirability of the Poway and El Cajon locations or evaluate customer convenience, but these criticisms do not preclude summary judgment. Stockton's declaration in fact support's GM position because it acknowledges that GM conducted a market study and took into account market shares for Buick-GMC and expected registrations, all factors in GM dealer network planning. The fact that De La Fuente was the only Cadillac dealer within the APR that did not also sell Buick-GMC lines, or that GM had overlapping

22

APRs for Grenier and De La Fuente does not give rise to an inference of improper motive or bad faith on GM's part. Nor are we persuaded that Wick's declaration concerning the closure of GM's Lemon Grove open point allows a conclusion that GM or its representatives acted out of animus.[9] GM's predecessor's actions in 2007, even if relevant to GM's liability in this case, do not permit a rational inference that a history of animus exists between GM and De La Fuente. In sum, we conclude plaintiff's evidence does not show GM conducted itself in such an unreasonable manner to frustrate plaintiff from obtaining the benefits under the De La Fuente dealer agreement, namely, plaintiff's right to an evaluation and final decision in light of dealer network planning considerations. Plaintiff has not demonstrated a triable issue of material fact to defeat summary judgment on its claim for breach of contract.

As plaintiff relies solely upon its previous arguments, our conclusion that summary judgment was proper on plaintiff's breach of contract cause of action necessarily disposes of its claim of breach of the implied covenant of good faith and fair dealing. (See *Agosta v. Astor* (2004) 120 Cal.App.4th 596 [covenant cannot impose substantive duties or limits on the contracting parties beyond those incorporated in the specific terms of their agreement; if a decision does not breach a substantive contract provision, it is not precluded by the covenant of good faith and fair dealing].)

---

9    The trial court sustained GM's objections on foundation, relevance and hearsay grounds to Wick's statement that GM had initially represented it would approve an application to transfer the McClellan Buick-GMC-Pontiac franchises to De La Fuente. We do not consider that statement in our analysis.

23

### III. *Intentional/Negligent Misrepresentation Causes of Action*

Plaintiff contends the trial court erred in granting summary judgment on its fifth and sixth causes of action for intentional and negligent misrepresentation. Specifically, plaintiff argues the trial court's interpretation of article 4.4.2 was erroneous as a matter of law; that the article "gives [plaintiff] a contractual right to seek GM's approval for adding vehicle lines" and a "corresponding duty upon GM to consider such approval 'in light of dealer network planning considerations' and pursuant to its 'business judgment.' " Plaintiff further argues the court's interpretation of Hardy's statement was "too narrow and constrained . . . ." According to plaintiff, reasonably construed, the evidence shows Hardy told Wick the *only* criteria to be satisfied to obtain GM's authorization to sell Buick and GMC vehicles with Cadillacs at plaintiff's El Cajon location was that both before and after there be only five Buick-GMC points in San Diego County. It asserts the trial court's ruling that Hardy's representation did not reflect a promise is an "exercise in hair-splitting" unsupported by Wick's declaration and the applicable standard of review.

Plaintiff's focus on the trial court's rulings is unhelpful, because, as we have stated, our role on appeal from a summary judgment is to assess the parties' papers and evidence de novo. (*Ace American Ins. Co. v. Walker* (2004) 121 Cal.App.4th 1017, 1027.) Plaintiff sets forth little in the way of contract interpretation principles to govern our interpretation of the De La Fuente dealer agreement, but more importantly, it has not presented any meaningful argument on the matter (other than telling us the trial court's interpretation is wrong as a matter of law) to justify reversal. Even where our review is de novo, the plaintiff is required to support its position with relevant legal arguments and

24

authority.  Absent meaningful argument, we conclude plaintiff has forfeited any challenge to summary judgment or adjudication on these causes of action.  (See *Taylor v. Roseville Toyota, Inc.* (2006) 138 Cal.App.4th 994, 1001, fn. 2.)

But considering the merits in any event, we would conclude summary judgment was properly granted on these causes of action.  To establish fraud, a plaintiff must show a misrepresentation (false representation, concealment, or nondisclosure), knowledge of falsity, and intent to induce reliance, justifiable reliance, and resulting damage.  (*Robinson Helicopter Co., Inc. v. Dana Corp*. (2004) 34 Cal.4th 979, 990; *Lazar v. Superior Court* (1996) 12 Cal.4th 631, 638.)  "A promise to do something necessarily implies the intention to perform; hence, where a promise is made without such intention, there is an implied misrepresentation of fact that may be actionable fraud.  [Citations.] [¶] An action for promissory fraud may lie where a defendant fraudulently induces the plaintiff to enter into a contract.  [Citations.]  In such cases, the plaintiff's claim does not depend upon whether the defendant's promise is ultimately enforceable as a contract." (*Lazar*, *supra*, 12 Cal.4th at p. 638.)  Where a fraud or misrepresentation claim is predicated on a failure to perform contractual obligations, " 'something more than nonperformance is required to prove the defendant's intent not to perform his promise.' " (*Tenzer v. Superscope*, *Inc.* (1985) 39 Cal.3d 18, 30-31; *Magpali v. Farmers Group, Inc*. (1996) 48 Cal.App.4th 471, 481.)

With respect to the essential element of justifiable or reasonable reliance, "whether a party's reliance was justified may be decided as a matter of law if reasonable minds can come to only one conclusion based on the facts."  (*Guido v. Koopman* (1991) 1

Cal.App.4th 837, 843; see also *Alliance Mortgage Co. v. Rothwell* (1995) 10 Cal.4th 1226, 1239.)  "[E]ach case in which it is claimed that fraud is involved must be considered on its own facts," in light of "the circumstances and condition of the parties." (*Koch v. Williams* (1961) 193 Cal.App.2d 537, 541.)  The elements of negligent misrepresentation also include justifiable reliance and damage.  (*Fox v. Pollack* (1986) 181 Cal.App.3d 954, 962.)

Plaintiff's causes of action for "intentional misrepresentation/promise without intent to perform" and negligent misrepresentation generally set forth alleged representations as to GM's willingness to perform in accordance with the terms and conditions of the contracts attached to the complaint, assertedly made by GM "agents and employees" without identifying who spoke or when.  In moving for summary judgment, GM pointed to the lack of specificity, and also argued that there could be no false representation to perform under the contracts because (1) GM was not a party to the plaintiff/Grenier proposed asset purchase agreement and (2) GM owed no obligations to plaintiff under the De La Fuente dealer agreement with respect to Buick and GMC lines, or under Grenier's dealer agreement.

Plaintiff opposed summary judgment with Wick's declaration, in which Wick stated:  "Each year GM hosts an annual event for dealers across the country which I and/or Mr. De La Fuente regularly attend.  At GM's annual event in Las Vegas in 2009, GM agent Kate Hardy in my presence set forth criteria for GM's approval of [De La Fuente] acquiring the Buick and GMC product lines; this being that GM only wanted 5 Buick/GMC locations (or, 'points' as they are known in the trade) in San Diego County.

26

[¶] In reliance on this representation by GM, I negotiated with [Grenier] the terms of acquiring the additional product lines and, specifically, paying $250,000 for these lines and $100.00 for each Buick or GMC what [*sic*] we sold for 5 years." Plaintiff also pointed to the dealer agreement and its May 2010 application for a change request in which GM assertedly represented it "would consider [De La Fuente's] application to acquire Grenier's product lines fairly and would not unreasonably refuse to approve it."[10] Plaintiff argued GM's intent not to perform these promises was evidenced by GM's actions in 2007, set out in paragraphs 5 though 8 of Wick's declaration, and the asserted absence of empirical data for GM's disapproval of plaintiff's application as set out in Stockton's declaration pertaining to GM's closure of the Lemon Grove open point.

Plaintiff's opposing summary judgment evidence did not raise a triable issue of material fact to avoid summary judgment on these claims. There is no dispute GM approved plaintiff's qualifications for purposes of a change in ownership, and disapproved the transaction only as to the *relocation* of the Buick-GMC dealership operations to El Cajon, which was a condition precedent to the De La Fuente/Grenier asset purchase. Hardy's asserted representation to Wick does not address criteria for dealership relocation, only criteria for an acquisition of the Buick-GMC product lines.

---

10    The GM policies in the record expressly do not govern relocation requests. Bulletin No. 04-09, accompanying plaintiff's May 2010 application for a change request, states: "This Bulletin addresses only the GM policies applicable to proposed changes to the ownership and management structure of GM dealerships. Dealer ownership changes are often accompanied by independent requests for dealership relocation, or proposed new dualling arrangements or other network planning considerations. *These requests should be evaluated separately in light of the applicable dealer network plan, and GM policies concerning those issues.*" (Italics added.)

Thus, plaintiff could not reasonably or justifiably rely on it to its detriment in entering into the relocation agreement.

Nor could plaintiff reasonably rely on Hardy's representation in view of the broad and comprehensive nature of De La Fuente dealer agreement, which plainly is intended to govern the entire business relationship of the parties. The agreement's purpose, among others, is to "state[] the terms under which Dealer and [GM] agree to do business together" and "state[] the responsibilities of Dealer and [GM] to each other and to customers . . . ." Additionally, the agreement states: "No [GM] representative is authorized to orally grant, waive or revise any terms of this Agreement or any rights conferred under this Agreement."[11] Under these circumstances, as a matter of law, plaintiff could not reasonably rely on Hardy's oral statements as setting forth criteria for the relocation proposal that would bind GM in any way.

---

[11]     In full, article 17.11 of the De La Fuente dealer agreement provides: "No agreement between [GM] and Dealer which relates to matters covered herein, including the grant or amendment of any Dealer Agreement and no change in, addition to (except the filling in of blank lines) or modification of this Agreement, will be binding unless approved in a written agreement executed by an authorized person. Approvals required or provided for under this Agreement must be in writing by an authorized person. No [GM] representative is authorized to orally grant, waive or revise any terms of this Agreement or any rights conferred under this Agreement. [GM] and Dealer expressly waive application of any local, state or federal law, statute, or judicial decision allowing oral grant, modifications, amendments or additions of a Dealer Agreement notwithstanding an express provision requiring a writing signed by the Parties."

28

IV. *Interference Claims*

A. *Interference with Prospective Economic Advantage*

To prove intentional interference with prospective economic advantage, plaintiff must show: (1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) an intentional act on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant. (*Edwards v. Arthur Andersen LLP* (2008) 44 Cal.4th 937, 944.) "The plaintiff must also prove that the interference was wrongful, independent of its interfering character. [Citation.] '[A]n act is independently wrongful if it is unlawful, that is, if it is proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard.' " (*Edwards*, at p. 944; see generally *Della Penna v. Toyota Motor Sales, USA, Inc*. (1995) 11 Cal.4th 376, 381-385.) An act is not independently wrongful merely because defendant acted with an improper motive. (*Korea Supply Co. v. Lockheed Martin Corp*. (2003) 29 Cal.4th 1134.)

One court has held the tort duty not to interfere falls only on strangers-interlopers who have no legitimate interest in the scope or course of the economic relationship. (*Kasparian v. County of Los Angeles* (1995) 38 Cal.App.4th 242, 262; see *Exxon Corp. v. Superior Court* (1997) 51 Cal.App.4th 1672; e.g., *Applied Equipment Corp. v. Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 513-514; *Mintz v. Blue Cross of California*

(2009) 172 Cal.App.4th 1594, 1603.)[12] In *Exxon Corp. v. Superior Court*, for example, in granting a summary judgment on a claim for tortious interference with business relationship, the appellate court held a franchisor gas supplier was found to have a "clear financial interest in its dealers" and was therefore "privileged to 'interfere' with the contract." (*Exxon Corp v. Superior Court*, at p. 1688; see also *Lowell v. Mother's Cake & Cookie Co.* (1978) 79 Cal.App.3d 13, 20-21 [invoking the privilege under Restatement of Torts section 769, that " '[o]ne who has a financial interest in the business of another is privileged purposely to cause him not to enter into or continue a relation with a third person in that business if the actor . . . (a) does not employ improper means, and . . . (b) acts to protect his interest from being prejudiced by the relation' " but holding on review of a demurrer the allegations of the complaint did not show such privilege as a matter of law].)

In moving for summary judgment, GM raised its preexisting right to evaluate and approve the De La Fuente/Grenier transaction, a showing meeting its threshold summary judgment burden. Plaintiff, however, did not address that issue. Rather, it argued below, and repeats the argument on appeal, that GM's " 'independent wrongful act' is not its

---

[12]    "There is an important limitation to the use of this tort as a remedy for the disruption of contractual relationships. *It can only be asserted against a stranger to the relationship.* '[C]onsistent with its underlying policy of protecting the expectations of contracting parties against frustration *by outsiders* who have no legitimate social or economic interest in the contractual relationship, the tort cause of action for interference with a contract does not lie against a party to the contract. [Citations.]' . . . [¶] . . . [T]he same rationale should also bar prosecution of the tort of interference with prospective economic advantage against a party to the relationship from which the plaintiff's anticipated economic advantage would arise." (*Kasparian v. County of Los Angeles*, *supra*, 38 Cal.App.4th at p. 262.)

conduct in exercising its own contract right to evaluate the addition of Buick and GMC lines to [plaintiff] under its 'business judgment.' "  Instead, according to plaintiff, "The wrongful conduct is GM's behind the scenes negotiations with Greiner to find another buyer or negotiate a price for shutting Greiner's doors—at the same time [plaintiff] was in a contract with Greiner to acquire its vehicle lines." (Emphasis omitted.)

Plaintiff's opposing summary judgment evidence consisted of e-mails exchanged on August 10, 2010, and August 12, 2010, one and two days after GM disapproved the relocation agreement.  In the first, Grenier's president Ryan Butterfield asked GM representative Alan Ray whether GM intended to buy Grenier out and replace it with prospective candidates, whether GM had a buyer for Poway, and whether GM intended to wind them down in Poway.  In the second, Butterfield acknowledged a telephone conversation and advised Ray he would have a dollar figure for him to "take us out."  In the third, Butterfield attached a letter noting GM had indicated its willingness to discuss closing of Grenier's Buick-GMC franchises, advised Ray that Grenier would accept the same consideration from GM as was specified under its agreement with De La Fuente, and welcomed further discussions of options with GM.

But plaintiff's evidence cannot overcome GM's demonstration of a legitimate interest and affirmative rights in connection with the relocation agreement, which in connection with this cause of action, eliminates any tort duty on GM's part.  Nor has plaintiff explained with any meaningful argument or authority how GM's communications with Grenier after GM already disapproved the transaction are unlawful, or somehow are proscribed by some constitutional, statutory, regulatory, common law, or

31

other determinable legal standard.  (*Edwards v. Arthur Andersen LLP*, *supra*, 44 Cal.4th at p. 944.)  Absent such a showing, GM is entitled to summary judgment on this cause of action.

B.  *Interference with Contract*

The underlying policy of an action for tortious interference with a contractual relationship is to "protect[] the expectations of contracting parties against frustration *by outsiders* who have no legitimate social or economic interest in the contractual relationship . . . ."  (*Applied Equipment Corp. v. Litton Saudi Arabia Ltd.*, *supra*, 7 Cal.4th at p. 514.)  The elements of such a claim are:  (1) a valid contract between plaintiff and Grenier; (2) GM's knowledge of the contract; (3) GM's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage.  (*Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 55; *Applied Equipment Corp. v. Litton Saudi Arabia Ltd.*, at p. 514, fn. 5; *LiMandri v. Judkins* (1997) 52 Cal.App.4th 326, 339.) "Because interference with an existing contract receives greater solicitude than does interference with prospective economic advantage [citation], it is not necessary that the defendant's conduct be wrongful apart from the interference with the contract itself." (*Quelimane Co.*, at p. 55.)

Plaintiff contends the trial court made a legal error in summarily adjudicating its cause of action alleging interference with the existing De La Fuente/Greiner contract because such a cause of action does not require proof of an independent wrongful act.  It further argues the court erred by disregarding the e-mails and letter presented in

32

opposition to summary judgment on grounds they had occurred after August 9, 2010, when GM declined to approve the proposed relocation.

Plaintiff's cursory arguments, which again unhelpfully challenge the trial court's reasoning as incorrect, do not persuade us to reverse the summary judgment. Plaintiff points out the e-mails and letter are dated only days after GM's rejection letter, and asserts on summary judgment the communications should be viewed in its favor as essentially contemporaneous. But plaintiff provides no meaningful argument or authority explaining why, even assuming we view GM's communications with Grenier as contemporaneous, that evidence precludes summary judgment on its tortious interference with contract claim. This is particularly the case where it is undisputed that the contract allegedly interfered with was expressly conditioned upon GM's approval of the transaction. Because that precondition had not been met, there can be no showing that GM's communications with Grenier on August 10, 2010, and August 12, 2010, interfered with a valid contract between Grenier and plaintiff. Stated another way, GM was contractually entitled to interfere with the De La Fuente/Grenier agreement; its consent was written in as a necessary antecedent for that agreement's validity, and GM exercised its right to withhold its consent.

## V. *Unfair Business Practices Cause of Action*

Plaintiff concedes that its ninth cause of action for unfair business practices was properly summarily adjudicated in GM's favor. Accordingly, we need not address that cause of action.

33

DISPOSITION

The judgment is affirmed.

O'ROURKE, J.

WE CONCUR:

McCONNELL, P. J.

IRION, J.