Filed 6/2/23

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| RHODA A. KANTER et al., | B312129 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. Nos. JCCP4861, BC611319, BC617444, BC664302, 37-2-16-000058421) |
| v. | |
| DEBRA L. REED et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Daniel J. Buckley, Judge. Affirmed.

Westerman, Jeff S. Westerman and Guido E. Toscano for Plaintiffs and Appellants.

Complex Appellate Litigation Group, Rex S. Heinke, Jessica M. Weisel; Gardy & Notis and Jennifer Sarnelli for Plaintiff and Appellant Rhoda A. Kanter.

Bottini & Bottini, Francis A. Bottini, Jr., Albert Y. Chang, and Yury A. Kolesnikov for Plaintiff and Appellant Arlander Favors.

Robbins, George Aguilar and Brian Robbins for Plaintiff and Appellant Nancy F. Lewis, as Trustee for the Nancy F. Lewis Trust.

Bragar Eagel & Squire, W. Scott Holleman, Marion C. Passmore, and Melissa Fortunato; Glancy Prongay & Murray, Robert V. Prongay and Ex Kano S. Sams, II for Plaintiff and Appellant Erste Asset Management GmbH.

Morgan, Lewis & Bockius, Thomas M. Peterson, Robert H. O'Leary, and J. Warren Rissier for Defendant and Respondent Sempra Energy.

O'Melveny & Myers, Matthew W. Close, Brittany Rogers, and Kelly McDonnell for Defendants and Respondents Dennis V. Arriola, Steven D. Davis, Joseph A. Householder, Jessie J. Knight, Jr., J. Bret Lane, and Martha B. Wyrsch.

Skadden, Arps, Slate, Meagher, & Flom and Allen L. Lanstra for Defendants and Respondents Alan L. Boeckmann, James G. Brocksmith, Jr., Kathleen L. Brown, Pablo A. Ferrero, William D. Jones, William G. Ouchi, Debra L. Reed, William C. Rusnack, William P. Rutledge, Lynn Schenk, Jack T. Taylor, and James C. Yardley.

# I.  INTRODUCTION

In this shareholders' derivative action, plaintiffs[1] appeal from a dismissal entered after the trial court sustained a demurrer on the grounds that plaintiffs failed to allege facts sufficient to show that a presuit demand on the board of directors (Board) of nominal defendant Sempra Energy (Sempra) was excused by futility.[2]  We affirm.

---

[1]    Plaintiffs are Arlander Favors, Rhoda A. Kanter, Nancy F. Lewis, as trustee for the Nancy F. Lewis Trust, and Erste Asset Management GmbH.

[2]    As explained below, Corporations Code section 800, subdivision (b)(2) requires a shareholder bringing a derivative action to allege "with particularity" the "efforts [made] to secure from the board such action as [the shareholder] desires, or the reasons for not making such effort . . . ."  Further statutory references are to the Corporations Code unless otherwise indicated.

## II.  BACKGROUND

A.    *Factual Background*[3]

Plaintiffs were stockholders of Sempra when the Aliso Canyon Natural Gas Storage facility (Aliso Canyon facility) experienced a natural gas leak (Aliso gas leak).[4]  Sempra was a California corporation "whose operating units invest[ed] in, develop[ed], and operate[d] energy infrastructure, and provide[d] gas and electricity services to [its] customers in North and South America."  One of Sempra's wholly-owned subsidiaries, Southern California Gas Company (SoCalGas), maintained the Aliso Canyon facility.

Defendants[5] were either officers of Sempra or members of the Board or officers or members of the board of directors of

---

[3]     "In this appeal following the sustaining of a demurrer, we assume the truth of the properly pleaded factual allegations, facts that reasonably can be inferred from those expressly pleaded and matters of which judicial notice has been taken." (*Fierro v. Landry's Restaurant Inc.* (2019) 32 Cal.App.5th 276, 281.)

[4]     See generally *Southern California Gas Leak Cases* (2019) 7 Cal.5th 391, 395–396.

[5]     Defendants William C. Rusnack, William D. Jones, Lynn Schenk, Alan L. Boeckmann, Jack T. Taylor, James C. Yardley, Kathleen L. Brown, Pablo A. Ferrero, Debra L. Reed, William G. Ouchi, James G. Brocksmith, Jr., and William P. Rutledge were members of the Board at the time of the Aliso gas leak (Director defendants).  Defendants Dennis V. Arriola, J. Bret Lane, Joseph A. Householder, Steven D. Davis, Martha B. Wyrsch, and Jesse J.

SoCalGas at the time of the Aliso gas leak.  When plaintiffs filed the operative amended complaint, eight of the 15 Board members had also been Board members at the time of the leak.[6]

The Aliso Canyon facility was "the largest natural gas storage reservoir in California[,] . . . one of the largest reservoirs in the United States," and the largest of Sempra's four underground natural gas storage facilities.  The Aliso gas leak occurred in the gas storage well designated SS-25 (Well).  The Board had actual knowledge of the substantial environmental, public health, and economic risks posed by the Aliso Canyon facility and the Well.

In 2000, the Board implemented a Board-level committee named the Environmental, Health, Safety, and Technology Committee (Committee).  The responsibilities of the Committee "included monitoring safety issues, including storage well safety . . . ."  Pursuant to its charter, the Committee "[was] responsible for reviewing 'environmental, health and safety laws, regulations and developments at the global, national, regional and local level and evaluation of ways to address these matters as part of Sempra's business strategy and operations.'"  Further, the Committee's "focus on environmental, health, safety and technology issues [was] consistent with the [B]oard's oversight role of corporate responsibility and stewardship."

---

Knight, Jr. were either officers of Sempra or SoCalGas, or directors of SoCalGas, at the time the Aliso gas leak occurred.

[6]     The eight Board members remaining from the time of the Aliso gas leak were Rusnack, Jones, Schenk, Boeckmann, Taylor, Yardley, Brown, and Ferrero.

Between January 2013 and October 2015, the Committee met 10 times and regularly reported to the Board.

On June 17, 2013, the Committee members discussed among themselves "'SoCalGas'[s] environmental and safety compliance management program,'" as well as a gas discharge incident at the Playa del Rey gas storage facility. The members also discussed "SoCalGas'[s] emergency response structure, training program, communication processes[,] . . . drills and simulations used to replicate emergency scenarios and reviewed lessons learned."

The Board received "periodic presentations from management and attempted to inform itself regarding risks to [Sempra] posed by potential problems with the pipelines." And, on May 9, 2014, at a Board meeting, the Board members discussed SoCalGas's "'state of the art'" natural gas pipeline safety enhancement program.

In June 2014, an executive attended the Board meeting and advised the Board about several factors to be included in SoCalGas's general rate case presentation to the California Public Utilities Commission (CPUC), including "cybersecurity protections, enterprise risk management, physical security and improved service, safety and reliability." At the meeting, "[t]he Board asked questions of management, all of which were answered to its satisfaction." The Board then expressed that SoCalGas should proceed with filing a notice of intent for the general rate case presentation with the CPUC.

As part of the general rate case presentation submitted in November 2014, SoCalGas sought a rate increase for a proposed "Storage Integrity Management Program" (SIMP) which was to be implemented in 2015. SoCalGas's executives had identified

significant deterioration of the underground storage wells at the Aliso Canyon and three other facilities. The SIMP proposed that all of SoCalGas's active gas injection wells, including the Well, be tested immediately in order to avoid unsafe conditions or an uncontrolled failure. The SIMP anticipated that following an inspection, additional repairs would be recommended.

On December 9, 2014, the Board received its annual risk-management report, which discussed, among other things, "'gas infrastructure safety and reliability risks.'"

In May 2015, a SoCalGas executive updated the Board on the general rate case and "outlined SoCalGas's focus on safety, reliability, customer service and the estimated timeframe for the rate case proceeding."

In September 2015, the Board received other general rate case updates from SoCalGas executives who described "the major cost drivers for the increases being requested by SoCalGas, including costs associated with maintaining and improving infrastructure and safety-related and compliance programs." "The Board asked questions" of the SoCalGas executives, "all of which were answered to the Board's satisfaction."

The combined total of meetings held by either the Board or the Committee between 2013 and 2015 was approximately 90.

On October 23, 2015, SoCalGas employees discovered the Aliso gas leak during a twice-daily observation of the Well. On October 26, 2015, SoCalGas reported the leak to several government agencies, including the California Emergency Management Agency. The gas leak continued until February 18, 2016. In a quarterly financial form submitted to the Securities and Exchange Commission on November 11, 2019,

7

Sempra disclosed that it had suffered at least $1.1 billion in damages as a result of the leak.

B.    *Procedural Background*

Beginning in February 2016, plaintiffs filed individual shareholder derivative actions against defendants for breach of fiduciary duty.

On August 10, 2017, plaintiffs filed a consolidated shareholder derivative complaint, alleging that defendants breached their fiduciary duties "by failing to take steps to maintain an adequate inspection program, documentation, monitoring, and risk management plan to ensure safety at [the] Aliso Canyon [facility], including [the Well]."  Plaintiffs also alleged that defendants aided and abetted the breach of fiduciary duty.  Plaintiffs did not serve a demand on the Board prior to filing suit and instead alleged that it would be futile to do so.

Defendants demurred, and, on November 4, 2019, the trial court sustained the demurrer with leave to amend, finding that plaintiffs failed sufficiently to allege that serving a demand on the Board would have been futile.

On February 5, 2020, plaintiffs filed the operative first amended complaint.  In support of the breach of fiduciary duty cause of action, plaintiffs alleged that defendants failed to be informed of "serious safety issues at Aliso Canyon" and "either knew, were reckless, or were grossly negligent in not knowing or acting upon the matters alleged . . . ."  According to plaintiffs, "[d]efendants completely abdicated their duty to receive information from management and regular reporting to ensure safety at [the] Aliso Canyon [facility], including [the Well] in the

8

years leading up to the leak." Plaintiffs also alleged defendants' "reckless approach to natural gas well safety, and their intentional decision to not adopt and implement a modern, effective and comprehensive risk assessment program for [Sempra's] natural gas wells, despite knowledge of increasing actual physical integrity problems at the wells, constitutes bad faith and disloyal conduct . . . ." Defendants again demurred.

On December 30, 2020, the trial court issued its ruling sustaining the demurrers, concluding that plaintiffs again failed sufficiently to allege demand futility. The court found instructive *In re Caremark International Inc.* (Del. Ch. 1996) 698 A.2d 959 (*Caremark*) and *Marchand v. Barnhill* (Del. 2019) 212 A.3d 805 (*Marchand*), Delaware cases involving claims that directors failed to exercise oversight. According to the court, plaintiffs had failed to state demand futility under *Marchand*, which required them to plead facts demonstrating "an utter failure by [d]efendants to attempt to assure a reasonable information and reporting system exists." At a subsequent hearing, plaintiffs indicated they would not seek leave to amend. On February 4, 2021, the court issued the judgment of dismissal from which plaintiffs timely appealed.

## III. DISCUSSION

### A. *Standard of Review*

We review the trial court's sustaining of a demurrer de novo. (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318.) "In reviewing the sufficiency of a complaint against a general demurrer, we are guided by long-settled rules. 'We treat the demurrer as admitting all material facts properly pleaded, but not

9

contentions, deductions or conclusions of fact or law. [Citation.] We also consider matters which may be judicially noticed.' [Citation.] Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context. [Citation.]" (*Ibid.*)[7]

"[In ruling on a demurrer, a] court generally confines itself to the pleading but, as appropriate, may extend its consideration to matters subject to judicial notice. [Citation.] '[W]hen the allegations of the complaint contradict or are inconsistent with such facts, we accept the latter and reject the former. [Citations.]' [Citation.] We give the same precedence to facts evident from exhibits attached to the pleading. [Citations.] Efforts to show *reasoning errors* are beside the point. "'Our only task in reviewing a ruling on a demurrer is to determine whether the complaint states a cause of action."' [Citations.] We do that independently [citation], regardless of reasons stated by the trial court. [Citation.]" (*Hill v. Roll Internat. Corp.* (2011) 195 Cal.App.4th 1295, 1300 (*Hill*).)[8]

---

[7]     Plaintiffs do not argue there is a reasonable possibility that any defects can be cured by amendment.

[8]     In ruling on the demurrer, the trial court took judicial notice of certain Board and Committee minutes, a ruling plaintiffs do not challenge on appeal. Plaintiffs contend, however, that the court did not just take judicial notice of the minutes but assumed the truth of the matters asserted therein. As plaintiffs' contention, at bottom, is a challenge to the court's reasoning, we need not address it. (*Hill, supra*, 195 Cal.App.4th at p. 1300.) In any event, because we conduct an independent review of the court's order, we do not rely on the court's interpretation of the minutes.

10

B.     *Shareholders' Derivative Actions and Demand Futility*

"It is a fundamental principle of corporate governance that the role of managing the business of the corporation is vested in its board of directors, not in its shareholders.  (*Grosset v. Wenaas* (2008) 42 Cal.4th 1100, 1108.)  This responsibility includes the prosecution, defense, and control of corporate litigation.  (*Ibid*.)  Judicial deference is accorded to directors under the 'business judgment rule,' which recognizes that where decisions are without fraud or breach of trust, 'management of the corporation is best left to those to whom it has been entrusted, not to the courts.  [Citation.]'  (*Desaigoudar v. Meyercord* (2003) 108 Cal.App.4th 173, 183.)  As codified in section 309, the business judgment rule obligates a director to perform his or her duties 'in good faith, in a manner such director believes to be in the best interests of the corporation and its shareholders and with such care, including reasonable inquiry, as an ordinarily prudent person in a like position would use under similar circumstances' (§ 309, subd. (a)); and it insulates a director from liability when he or she performs those obligations in the manner provided in the statute (§ 309, subd. (c))."  (*Bader v. Anderson* (2009) 179 Cal.App.4th 775, 787–788, fn. omitted (*Bader*).)

"This principle that the corporation must bring suit on its own behalf notwithstanding, where the directors fail or refuse to act, a shareholder has a sufficient interest in the entity 'to justify the bringing of a "propulsive" action, designed to set in motion the judicial machinery for the redress of the wrong to the corporation.  [Citations.]'  (*Klopstock v. Superior Court* (1941) 17 Cal.2d 13, 16–17 . . . .)  '[T]he corporation is the ultimate beneficiary of such a derivative suit . . . .'  (*Id*. at p. 21.)  A

11

derivative lawsuit is in essence a consolidation in equity of two suits, one by the shareholder against the directors seeking an order that they sue those who have wronged the corporation, and the other by the corporation against the wrongdoers. (*Daily Income Fund, Inc. v. Fox* (1984) 464 U.S. 523, 529, fn. 4.) A presuit demand on the directors, however, is ordinarily required for the bringing of a derivative action." (*Bader, supra*, 179 Cal.App.4th at pp. 788–789.)

"This requirement that a shareholder establish that he or she made a "'suitable demand, unless excused by extraordinary conditions . . ." [citation]' (*Kamen v. Kemper Financial Services, Inc.* (1991) 500 U.S. 90, 96 (*Kamen*)), "'is to encourage intracorporate resolution of disputes and to protect the managerial freedom of those to whom the responsibility of running the business is delegated . . . .'" (*Shields v. Singleton* (1993) 15 Cal.App.4th 1611, 1619 (*Shields*).) The demand requirement is also intended to prevent the abuse of the derivative suit remedy. (*Kamen,* [*supra*, 500 U.S.] at pp. 95–96.) . . . California's demand requirement under section 800[, subdivision ](b)(2) is similar to the federal rule and requires that the plaintiff in a shareholder derivative suit 'allege[] in the complaint with particularity plaintiff's efforts to secure from the board such action as plaintiff desires, or the reasons for not making such effort, and allege[] further that plaintiff has either informed the corporation or the board in writing of the ultimate facts of each cause of action against each defendant or delivered to the corporation or the board a true copy of the complaint which plaintiff proposes to file.'" (*Bader, supra*, 179 Cal.App.4th at pp. 789–790.)

"'Although "jurisdictions differ widely in defining the circumstances under which demand on directors will be excused," [citation], demand typically is deemed futile when a majority of the directors have participated in or approved the alleged wrongdoing, [citation], or are otherwise financially interested in the challenged transactions, [citation].' (*Kamen, supra*, 500 U.S. at pp. 101–102, fn. omitted.) . . . [G]iven the requirement under section 800[, subdivision ](b)(2) that allegations be made 'with particularity,' it is clear that general averments that the directors were involved in a conspiracy or aided and abetted the wrongful acts complained of will not suffice to show demand futility. (*Shields, supra*, 15 Cal.App.4th at p. 1621.) Likewise, a general claim that there is nationwide structural bias common to corporate boards will not excuse the making of a demand before bringing a derivative suit. (*Oakland Raiders v. National Football League* (2001) 93 Cal.App.4th 572, 587 [(*Oakland Raiders*)].) Rather, 'the court must be apprised of facts specific to each director from which it can conclude that that particular director could or could not be expected to fairly evaluate the claims of the shareholder plaintiff.' (*Shields*, [*supra*, 15 Cal.App.4th] at p. 1622.) Thus, the court, in reviewing the allegations to support demand futility, must be able to determine on a director-by-director basis whether or not each possesses independence or disinterest such that he or she may fairly evaluate the challenged transaction. (*Oakland Raiders*[*, supra*, 93 Cal.App.4th] at p. 587.)" (*Bader, supra*, 179 Cal.App.4th at p. 790.)

"California courts commonly look to two tests enunciated by the Delaware Supreme Court for determining the adequacy of the pleading of demand futility. Where a decision of the board of directors is challenged in the derivative suit, the *Aronson* test

13

asks 'whether, under the particularized facts alleged, a reasonable doubt is created that: (1) the directors are disinterested and independent [or] (2) the challenged transaction was otherwise the product of a valid exercise of business judgment.' (*Aronson v. Lewis* (Del. 1984) 473 A.2d 805, 814 (*Aronson*); accord *Bader, supra*, 179 Cal.App.4th at p. 791; *Oakland Raiders*[*, supra*,] 93 Cal.App.4th [at p.] 587 . . .) But where 'the board that would be considering the demand did not make a business decision which is being challenged in the derivative suit' (*Rales v. Blasband* (Del. 1993) 634 A.2d 927, 933– 934 (*Rales*)), the *Rales* test asks whether 'the particularized factual allegations of a derivative stockholder complaint create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand. If the derivative plaintiff satisfies this burden, then demand will be excused as futile' (*Rales, supra*, [634 A.2d] at p. 934; accord *Bader*, *supra*, [179 Cal.App.4th] at pp. 791–792 [summarizing *Rales*]).)" (*Apple Inc. v. Superior Court* (2017) 18 Cal.App.5th 222, 233, fn. omitted (*Apple*).)[9] Here, the parties agree that the *Rales* test applies to plaintiffs' allegation of demand futility.

---

[9] *Aronson* was overruled on another point not relevant here. (*Brehm v. Eisner* (Del. 2000) 746 A.2d 244, 254–255.)

The Delaware Supreme Court recently combined the *Rales* and *Aronson* tests. (*United Food & Commercial Workers Union v. Zuckerberg* (Del. 2021) 262 A.3d 1038, 1058; see *Tola v. Bryant* (2022) 76 Cal.App.5th 746, 752.)

14

C.    *Substantial Likelihood of Liability*

1.    Applicability of *Caremark* Standard in California

Under the *Rales* test, "[d]irectorial interest . . . exists where a corporate decision will have a materially detrimental impact on a director, but not on the corporation and the stockholders.  In such circumstances, a director cannot be expected to exercise his or her independent business judgment without being influenced by the adverse personal consequences resulting from the decision."  (*Rales, supra*, 634 A.2d at p. 936.)[10]  Directors are not impartial or disinterested if they face a "'"substantial likelihood"'"" of personal liability.  (See *Apple, supra*, 18 Cal.App.5th at p. 256; *Bader, supra*, 179 Cal.App.4th at p. 798; see also *Rales, supra*, 634 A.2d at p. 936; *Aronson, supra*, 473 A.2d at p. 815.)

Under Delaware law, "*Caremark* articulates the necessary conditions for assessing director oversight liability."  (*Stone v. Ritter* (2006) 911 A.2d 362, 365, fn. omitted (*Stone*).)  "[T]he stockholders must allege 'that a director acted inconsistent with his fiduciary duties and, most importantly, that the director *knew* he was so acting.'  This is because a *Caremark* claim 'is rooted in concepts of bad faith; indeed, a showing of bad faith is a *necessary condition* to director oversight liability.'  . . .  Because of the difficulties in proving bad faith director action, a *Caremark* claim

---

[10]    Plaintiffs do not allege that a demand would have been futile because a director (1) received an improper benefit or (2) lacked independence because the director was beholden to an interested director, officer, or controlling shareholder.  (See *Bader, supra*, 179 Cal.App.4th at p. 792; *Rales, supra*, 634 A.2d at p. 936.)

15

is 'possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment.'" (*City of Birmingham Retirement and Relief System v. Good* (Del. 2017) 177 A.3d 47, 55, fns. omitted.)

Plaintiffs concede that under both California and Delaware law, a substantial likelihood of liability is a ground for finding that a director is partial or interested.  They contend, however, that whether directors face a substantial likelihood of liability is "a question of substantive law," governed by California law, which materially differs from the law of Delaware.  In their view, the trial court therefore erred in following *Caremark* and its progeny.

### a.    Limitations on Director Liability

According to plaintiffs, in California, unlike in Delaware, directors have a duty of "reasonable inquiry," as set forth in section 309, subdivision (a).  That section requires, among other things, that a director engage in "reasonable inquiry, as an ordinarily prudent person in a like position would use under similar circumstances."  According to plaintiffs, the trial court erred by relying on Delaware law and failing to apply section 309, subdivision (a).  We disagree.

Although section 309, subdivision (a) describes the general duty of directors, it does not address the question at issue here, that is, whether *these* Director defendants faced a substantial likelihood of *personal liability* for their conduct.  And, on this question, California corporations may elect to limit director liability.  (§ 204.5, subd. (a).)

16

Specifically, section 204, subdivision (a)(10) provides, in pertinent part, that articles of incorporation may set forth: "Provisions eliminating or limiting the personal liability of a director for monetary damages in an action brought by or in the right of the corporation for breach of a director's duties to the corporation and its shareholders, as set forth in Section 309, provided, however, that (A) such a provision may not eliminate or limit the liability of directors (i) for acts or omissions that involve intentional misconduct or a knowing and culpable violation of law, (ii) for acts or omissions that a director believes to be contrary to the best interests of the corporation or its shareholders or that involve the absence of good faith on the part of the director, (iii) for any transaction from which a director derived an improper personal benefit, (iv) for acts or omissions that show a reckless disregard for the director's duty to the corporation or its shareholders in circumstances in which the director was aware, or should have been aware, in the ordinary course of performing a director's duties, of a risk of serious injury to the corporation or its shareholders, (v) for acts or omissions that constitute an unexcused pattern of inattention that amounts to an abdication of the director's duty to the corporation or its shareholders . . . ." (§ 204, subd. (a)(10).)

Here, Sempra's articles of incorporation provide: "The liability of the directors of the Corporation for monetary damages shall be eliminated to the fullest extent under California law." Sempra therefore adopted the limiting provisions for director liability set forth at section 204, subdivision (a)(10). (§ 204.5, subd. (a).)

Plaintiffs do not allege that defendants engaged in intentional misconduct or knowing violations of the law. Nor do

17

they allege that defendants derived an improper benefit from a transaction.  Instead, plaintiffs allege that defendants engaged in acts or omissions that:  show a reckless disregard of a director's duties to the corporation or shareholders (§ 204, subd. (a)(10)(iv)) and constitute an unexcused pattern of inattention that amounts to an abdication of duty (§ 204, subd. (a)(10)(v)).  "Where, as here, there is no published California decision that addresses the precise issue before us, out-of-state decisions may provide 'useful guidance.'" (*Jackson v. Superior Court* (2018) 25 Cal.App.5th 515, 532, fn. 11.)  California courts have routinely relied "on corporate law developed in the State of Delaware given that it is identical to California corporate law for all practical purposes." (*Oakland Raiders, supra*, 93 Cal.App.4th at p. 586, fn. 5; accord, *Apple, supra*, 18 Cal.App.5th at p. 244, fn. 9.)  Thus, we next consider whether the definitions of director liability set forth at section 204, subdivisions (a)(10)(iv) and (a)(10)(v) are consistent with *Caremark* and its progeny.

b.      Reckless Disregard of Duties

The Corporations Code does not define the term "reckless disregard."  We therefore construe that term in accordance with its ordinary legal meaning.  (Civ. Code, § 13; *Brown v. Superior Court* (2016) 63 Cal.4th 335, 351 ["It is a venerable principle that when a word or phrase appearing in a statute 'has a well-established *legal* meaning, it will be given that meaning in construing the statute'"].)  "Reckless disregard" is a "[c]onscious indifference to the consequences of an act" or "[t]he intentional commission of a harmful act or failure to do a required act when the actor knows or has reason to know of facts that would lead a

18

reasonable person to realize that the actor's conduct both creates an unreasonable risk of harm to someone and involves a high degree of probability that substantial harm will result." (Black's Law Dict. (11th ed. 2019).)

Applying this definition, we conclude that a director acts with "reckless disregard" of his duties, within the meaning of section 204, subdivision (a)(10)(iv) when the director (1) does an intentional act or intentionally fails to act in accordance with those duties, (2) with knowledge, or with reason to have knowledge, that (3) the director's conduct creates a substantial risk of serious harm to the corporation or its shareholders.

Similarly, in Delaware, an "intentional dereliction of duty, a conscious disregard for one's responsibilities" is akin to "acts or omissions not in good faith" (*Brehm v. Eisner* (*In re Walt Disney Co. Derivative Litigation*) (Del. 2006) 906 A.2d 27, 65–66 (*Walt Disney*)), and therefore *Caremark* is consistent with section 204, subdivision (a)(10)(iv). Contrary to plaintiffs' contention, supported by their citation to an unpublished Court of Chancery opinion (*McElrath v. Kalanick* (Del. Ch. Apr. 1, 2019) 2019 Del. Ch. LEXIS 107, *28), Delaware case authority does not exclude from liability a director's reckless disregard of his or her duties. (See *Walt Disney*, *supra*, 906 A.2d at p. 67, fn. 111 [transaction that results from a director's "'reckless indifference to or a deliberate disregard of the interests of the whole body of stockholders'" requires further judicial scrutiny for bad faith conduct].)

19

c. Unexcused Inattention Amounting to
Abdication of Duty

We next consider the meaning of the term "abdication of duty" as set forth in section 204, subdivision (a)(10)(v). Again, the Corporations Code provides no definition.[11] Thus, we again apply the plain and ordinary meaning of the word. (Civ. Code, § 13.) "Abdication" is "[t]he act of renouncing or abandoning privileges or duties." (Black's Law Dict. (11th ed. 2019).) The act of renouncing or abandoning one's duties requires an intentional decision because, in order to renounce or abandon it, one must be aware of the duty owed in the first instance. (See *Del Giorgio v. Powers* (1938) 27 Cal.App.2d 668, 680 ["there can be no abandonment without an intention to abandon"].)

Delaware deems "the intention[al] fail[ure] to act in the face of a known duty to act" as "describ[ing], and [being] fully consistent with, the lack of good faith conduct that the *Caremark* court held was a 'necessary condition' for director oversight

_____

[11] Plaintiffs cite *Gaillard v. Natomas Co.* (1989) 208 Cal.App.3d 1250 (*Gaillard*), to argue that a director's abdication of duties is a violation of the business judgment rule and the reasonable inquiry duty under section 309. The Court of Appeal held, "Notwithstanding the deference to a director's business judgment, the rule does not immunize a director from liability in the case of his or her abdication of corporate responsibilities . . . ." (*Gaillard, supra*, 208 Cal.App.3d at p. 1263.) Plaintiffs' assertion is correct that a director's abdication of corporate duty violates section 309. *Gaillard*, however, does not discuss the meaning of "abdication of duty" in the context of section 204, subdivision (a)(10)(v), and thus does not assist in interpreting the term. (*B.B. v. County of Los Angeles* (2020) 10 Cal.5th 1, 11 [""'cases are not authority for propositions not considered'""].)

liability, i.e., 'a sustained or systematic failure of the board to exercise oversight—such as an utter failure to attempt to assure a reasonable information and reporting system exists . . . .'" (*Stone*, *supra*, 911 A.2d at p. 369, fn. omitted.)  An "intention[al] fail[ure] to act in the face of a known duty to act" expresses the same concept as an "unexcused pattern of inattention that amounts to an abdication of the director's duty."  Accordingly, the *Caremark* standard is consistent with section 204, subdivision (a)(10)(v).

2.  Application of *Caremark*

Having found that Delaware corporation law provides useful guidance to the issues presented here, we now address plaintiffs' alternative argument that they have alleged a substantial likelihood of liability under *Caremark* against the Director defendants.

"Bad faith is established, under *Caremark*, when 'the directors [completely] fail[] to implement any reporting or information system or controls[,] or . . . having implemented such a system or controls, consciously fail[] to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention.'  In short, to satisfy their duty of loyalty, directors must make a good faith effort to implement an oversight system and then monitor it." (*Marchand, supra*, 212 A.3d at p. 821, fn. omitted.)

Plaintiffs contend that they have alleged conduct similar to that at issue in *Marchand, supra*, 212 A.3d 805.  In *Marchand,* nominal defendant Blue Bell produced one product, ice cream. (*Id.* at p. 809.)  Over a five-year period, federal and state

21

regulators cited several of Blue Bell's factories for food safety violations. (*Id.* at pp. 811–812.) And, over a two-year period, the company's own inspectors and regulators found listeria in multiple factories across several states. (*Id.* at pp. 813–815.) Blue Bell's ice cream eventually became contaminated with listeria, resulting in a complete recall and the initiation of a federal investigation. (*Id.* at pp. 814–815.)

After reviewing Blue Bell's books and records, the plaintiff, a Blue Bell stockholder, sued the company's board for failing, under C*aremark*, to implement any reporting system and failing to be informed about Blue Bell's food safety compliance. (*Marchand, supra*, 212 A.3d at pp. 815–816.) The Court of Chancery granted Blue Bell's motion to dismiss. (*Id*. at p. 816.) The Delaware Supreme Court reversed, finding the plaintiff had alleged bad faith conduct by the board: "no board committee that addressed food safety existed"; "no regular process or protocols that required management to keep the board apprised of food safety compliance practices, risks, or reports existed"; "no schedule for the board to consider on a regular basis, such as quarterly or biannually, any key food safety risks existed"; "during a key period leading up to the deaths of three customers, management received reports that contained what could be considered red, or at least yellow, flags, and the board minutes of the relevant period revealed no evidence that these were disclosed to the board"; "the board was given certain favorable information about food safety by management, but was not given important reports that presented a much different picture"; and "the board meetings are devoid of any suggestion that there was any regular discussion of food safety issues." (*Id.* at p. 822.)

Here, the judicially-noticed Board minutes demonstrate the existence of some oversight by the Board over SoCalGas's gas storage infrastructure. For example, the December 2014 Board minutes reflect that the Board received an annual risk management report regarding, among other things, "'gas infrastructure safety and reliability risks.'" Additionally, in 2000, Sempra formed the Committee, which was obligated to monitor well safety and conducted 10 meetings from January 2013 to October 2015. The Committee also reported to the Board on a gas discharge at the Playa del Rey storage facility.

Plaintiffs, however, assert that the Board minutes failed to demonstrate that defendants discussed gas *storage* infrastructure, as compared to pipeline infrastructure, and argue that all reasonable inferences should be construed in their favor. Plaintiffs also dispute whether the Board was aware of the purpose of the general rate case presentation and the SIMP. At bottom, plaintiffs' allegations challenge the efficacy of the monitoring system in place and "general averments that the directors were involved . . . in a conspiracy or aided and abetted the wrongful acts complained of will not suffice to show demand futility." (*Bader, supra*, 179 Cal.App.4th at p. 790.) Such allegations do not constitute particularized facts that create a reasonable doubt as to whether the Director defendants here face a substantial likelihood of liability for, in this case, intentionally abandoning or abdicating their duties to monitor. "[O]ur focus here is on the key issue of whether [plaintiffs have] pled facts from which we can infer that [the] board made no effort to put in place a board-level compliance system. That is, we are not examining the effectiveness of a board-level compliance and reporting system after the fact. Rather, we are focusing on

23

whether the complaint pleads facts supporting a reasonable inference that the board did not undertake good faith efforts to put a board-level system of monitoring and reporting in place." (*Marchand, supra*, 212 A.3d at p. 821.)

As alleged, and contrary to plaintiffs' allegations that there was no reporting mechanism in place for safety issues regarding gas storage, the Board formed the Committee, which provided regular reports to the Board, and whose purpose included, among other things, monitoring SoCalGas's storage infrastructure for safety. Additionally, the Board received annual risk management reports. The Board also approved SoCalGas's notice of intent to file a general rate case and received updates regarding it. And, the general rate case presentation included a rate increase for the SIMP in order to investigate potential well integrity issues. In short, plaintiffs have not alleged particularized facts supporting their *Caremark* theory of liability, and thus have failed to plead demand futility as required under section 800, subdivision (b)(2).

D.    *The Fazio Action*

Plaintiffs also assert an alternative theory of demand futility, arguing that the Board's response to a demand made by a shareholder prior to filing an individual derivative action against the Board (the Fazio action) demonstrates that any demand that they would have made on the Board would have been met with a similar response and would therefore have been futile. We disagree.

24

1. Background

On April 13, 2016, Charles Fazio, another Sempra shareholder, submitted a demand that the Board pursue claims against certain directors and officers for alleged breaches of fiduciary duty based on their conduct prior to and during the Aliso gas leak. On June 24, 2016, the Board created a demand review committee to investigate and make recommendations about what, if any, actions to take in response.

On March 1, 2017, Fazio filed a shareholder derivative action against the Board.

On November 4, 2019, the trial court sustained defendants' demurrer to the Fazio action with leave to amend. The court concluded that Fazio failed to allege facts showing his demand had been refused because the Board needed more time to analyze the demand due, in part, to the complexity of the litigation pending against Sempra and SoCalGas.

On June 23, 2022, while this appeal was pending, Fazio filed an amended complaint alleging that he had received a demand refusal from the demand review committee. On November 30, 2022, the trial court sustained Sempra's demurrer to Fazio's amended complaint without leave to amend.[12]

2. Analysis

Plaintiffs contend that they sufficiently alleged demand futility because the Board, by failing to act on Fazio's demand,

---

[12] We judicially notice Fazio's amended complaint and the trial court's order sustaining Sempra's demurrer. (Evid. Code, § 452, subd. (d).)

demonstrated that any similar demand made by plaintiffs would have been futile.

As noted, while this appeal was pending, the Board acted on Fazio's demand and refused it.  Thus, plaintiffs' contention that the Board failed to act on Fazio's demand is now moot. (*Association of Irritated Residents v. Department of Conservation* (2017) 11 Cal.App.5th 1202, 1221–1222.)  Moreover, the Board's eventual refusal of the Fazio demand does not, by itself, demonstrate that *any* demand would have been futile.  At best, the eventual *refusal* of Fazio's demand made it more probable that the Board would have also *refused* plaintiffs' demand.  But it does not demonstrate that it would have been *futile* for plaintiffs to make such a demand.  (*Rales*, *supra*, 634 A.2d at pp. 933–934.) Accordingly, the cases cited in plaintiffs' brief that address when a complaint sufficiently alleges that a plaintiff has *filed* a demand that a board of directors has *refused* (see *Rich ex rel. Fuqi Int'l, Inc. v. Yu Kwai Chong* (Del. Ch. 2013) 66 A.3d 963, 977; *Thorpe v. CERBCO, Inc.* (Del. Ch. 1991) 611 A.2d 5, 11) are inapposite.  And, for the reasons we discuss above, plaintiffs' allegations do not otherwise sufficiently allege a substantial likelihood of director liability.

26

## IV. DISPOSITION

The judgment of dismissal is affirmed.  Defendants are entitled to costs on appeal.

CERTIFIED FOR PUBLICATION


KIM, J.


I concur:


MOOR, J.

## *Kanter et al. v. Reed et al. – B312129*

RUBIN, P. J. – Dissenting:

I respectfully dissent.

The majority agrees that, at the time the plaintiffs filed the operative complaint, eight of the fifteen board members – a majority – had been on the Board at the time of the gas leak. (Maj. Opn. at p. 5 & fn. 6.) The issue presented by this appeal, simply, is whether plaintiffs have alleged facts sufficient to raise a reasonable doubt that the Board could have properly exercised its independent and disinterested business judgment in responding to a demand that it authorize a corporate suit against, among others, a majority of its current members. (*Rales v. Blasband* (Del. 1993) 634 A.2d 927, 934.) This, in turn, depends on whether the majority of board members, who had been on the board at the time of the leak, face a substantial likelihood of personal liability in the action. (*Id.* at p. 936.)

In this way, the "futility" requirement turns into an evaluation of the merits of the action. If the action has merit, the individual defendants face a substantial likelihood of personal liability, and the futility requirement is satisfied. That brings me to *In re Caremark International* (Del. Ch. 1996) 698 A.2d 959, 969–970 (*Caremark*), which acknowledged a cause of action for director liability for failure to be reasonably informed concerning the corporation; and *Marchand v. Barnhill* (Del. 2019) 212 A.3d 805 (*Marchand*), which explained the standard for a *Caremark* claim.

The majority agrees that the *Marchand* test applies: "Bad faith is established, under *Caremark*, when 'the directors

[completely] fail[ ] to implement any reporting or information system or controls[,] or . . . having implemented such a system or controls, consciously fail[ ] to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention.'  In short, to satisfy their duty of loyalty, directors must make a good faith effort to implement an oversight system and then monitor it."  (*Marchand, supra,* 212 A.3d at p. 821, fn. omitted.)

Bearing in mind that the case is only at the pleading stage, I believe we need consider only the first alternative – complete failure to implement any reporting or information system or controls.  In their operative complaint, plaintiffs repeatedly allege that the Board members "completely failed to adopt and implement a board-level reporting system with respect to the company's underground storage wells."  Although somewhat conclusory, the complaint goes on to flesh out the details.  For example, plaintiffs allege that SoCalGas Storage Engineering Manager James Mansdorfer repeatedly warned management regarding safety concerns, but "[t]here was no mechanism for reporting [his] safety concerns and remediation recommendations to the Board."  Plaintiffs further allege that, in 2013, leaks were discovered in two wells at Aliso Canyon.  Although individuals at SoCalGas were concerned that capital well work repairs were behind schedule, resulting in multiple wells with " 'some type of well integrity issue,' " there is no indication that any of the Board directors "learned about, discussed, or inquired about, those two 2013 leaks or the maintenance issues and safety work backlog raised by management and a senior storage engineer.  There is no indication that those Director Defendants had any system or reporting mechanism for learning about these two leaks or the

safety concerns of senior knowledgeable corporate personnel . . . ." Plaintiffs allege that, as to *above-ground gas transmission pipelines*, the Board received periodic presentations from management regarding risks; but, when it came to *underground storage wells*, "the Board received no reports, failed to inform itself about the risks posed by the wells, and failed to discuss any germane matters regarding gas storage at Board meetings."

According to plaintiffs, Board and Committee minutes revealed "that the Board and the [Committee] periodically discussed safety issues relating to pipeline safety (as opposed to well safety)." There was only one mention of gas storage wells – following a discharge at the Playa del Rey SoCalGas storage facility. This, according to plaintiffs, reflects "the failure to adopt or implement any Board-level reporting process regarding the significant risks posed by the Company's underground storage wells . . . ."

Defendants' demurrer argued that the Board did, in fact, discuss safety of gas storage practices, relying on (1) an excerpt from December 8-9, 2014 Board minutes reflecting a discussion of " 'gas infrastructure safety and reliability risks' " in the context of Sempra's " 'overall risk management philosophy' "; (2) June 17, 2013 minutes of the Committee meeting which discussed " 'emergency response practices' " following the "gas storage incident" at Playa del Rey; and (3) the operative complaint's reference to the Board's awareness of a May 2, 2014 Aliso Canyon Safety Plan.

As to the first, the December 8-9, 2014 Board meeting minutes show the relevant discussion under the heading, "Annual Risk Management Report." Kathryn Collier, identified only as a representative of Sempra, "described various risks

3

facing [Sempra] including regulatory environment and political risks, gas infrastructure safety and reliability risks, electric infrastructure safety and reliability risks, cybersecurity, infrastructure project execution and employee/customer safety and workplace violence.  She discussed the nature of these risks and the ways [Sempra] mitigates such risks."  There is no indication that this brief mention of "gas infrastructure safety" specifically addressed SoCalGas's underground well storage, or that the Board expected Sempra's "Annual Risk Management Report" to do so.

As to the second, the June 17, 2013 Committee meeting minutes reflect the relevant discussion under the heading of "Environmental, Worker Safety, Pipeline Integrity and Emergency Response Programs," and the subheading "SoCalGas."  As part of its report, SoCalGas discussed its "environmental and safety compliance management program," with specific mention of "certain occurrences during the prior year, including a gas discharge incident at SoCalGas's Playa del Rey storage facility, and discussed corrective actions taken by management in response to those occurrences."  In addition, SoCalGas reported on its "gas system safety and pipeline integrity management program and its pipeline safety plan. [SoCalGas] noted that the safety plan included more than ten individual plans and discussed safety values and principles that are incorporated into each plan.  The report included assessments of how technology is being used to create additional safeguards." While these minutes specifically mention the gas discharge at Playa del Rey, safety plans in general and pipeline integrity in particular, they make no specific mention of gas well storage integrity, and therefore do not establish that the Board, through

4

the Committee, had a reporting system by which it was aware of the safety risks presented by SoCalGas's gas storage wells.

As to the third, plaintiffs' complaint alleged that the May 2014 Aliso Canyon Safety Plan "did not call for the involvement of any senior Company executives in the safety plan, and instead ensconced an electrical engineer as the lead member of the Aliso Canyon Safety Committee. The main purpose of the safety plan seems to have been to 'meet the needs of the high fire dangers and unique conditions of Aliso Canyon' and thus primarily addresses fire hazards at Aliso Canyon. The safety plan, while lengthy, mostly encouraged employees to pay lip service to safety by always 'dress[ing] appropriately for work [and] perform[ing] the circle of safety.' The safety plan, while well-intentioned, did absolutely nothing to address the infrastructure problems and lack of functioning safety valves and other problems at Aliso Canyon. Further, while the safety plan purports to incorporate storage policies and procedures, these referenced policies either did not address the infrastructure problems at Aliso Canyon or were not monitored or implemented to ensure safety at Aliso Canyon." Plaintiffs allege this was nothing more than a "feel good" safety plan intended to provide only "an appearance of safety preparation." This, too, fails to establish a Board-level reporting plan regarding the safety risks of underground gas storage wells.[1]

---

[1]      Defendants also rely on proceedings before the CPUC wherein SoCalGas sought a rate hike to address the safety risks posed by the storage wells at Aliso Canyon. But plaintiffs allege that defendants did not review the testimony of SoCalGas prior to its submission to the CPUC, and the Board did not make itself aware of the specific safety risks encompassed in SoCalGas's request for a rate hike. Knowing broadly that SoCalGas sought a

In short, plaintiffs' complaint paints a picture of a Board that had its head in the sand about the danger of SoCalGas's wells in the ground. Individuals who were aware of the dangers were repeatedly sounding the alarm bell, but there was no means for the Board to hear it. In response to these allegations, the Board combed through the minutes of its own meetings and those of the Committee, only to find references to infrastructure safety that are, at best, ambiguous as to whether they encompassed underground storage wells.

The majority sees this as an irrelevant difference of degree – concluding that the Board had "some" oversight over gas storage infrastructure, which it holds is sufficient under *Marchand*. (Maj. Opn., pp. 22–23.) I do not share that view. A brief mention of "gas infrastructure safety" in the course of overall risk management; a discussion of remedies taken after a gas discharge at another facility and a pipeline safety plan; and Board awareness of a "feel good" Aliso Canyon plan do not add up to proof of the existence of a system of Board oversight over aging gas storage wells at Aliso Canyon. *Marchand* requires a good faith effort to implement an oversight system; these sporadic references do not indicate, as a matter of law, that either the Board itself or its Committee had implemented such an oversight apparatus.

On this record, I would conclude plaintiffs have raised a reasonable doubt that the Board would have addressed a demand

rate hike to address safety risks is different from knowing what those safety risks were, and even further different from having a reporting program in place to receive timely notice about the risks as they arose. This is particularly so because, if the risks were critical, they should have been remediated regardless of whether SoCalGas's proposed rate hike was approved.

6

independently; therefore, plaintiffs' failure to make a demand was excused on ground of futility.  For the same reasons, I would conclude defendants' demurrer should have been overruled on the merits.  I would therefore reverse.


RUBIN, P. J.